**DAVIS BROTHERS, Appellants,**

**v.**

**MISCO LEASING, INC., Appellee.**

**No. 8407.**

Court of Civil Appeals of Texas, Amarillo.

Feb. 19, 1974.

Gordon Treadaway, Lubbock, for appellants.

Crenshaw, Dupree & Milam (William J. Wade), Lubbock, for appellee.

ELLIS, Chief Justice.

In this suit on an agreement designated as a lease covering certain irrigation equipment, the trial court entered judgment in favor of Misco Leasing, Inc., lessor, against Davis Brothers, lessees, and Plains Supply Company, the supplier and guarantor, for the recovery of a deficiency after repossession and sale of the equipment. A default judgment was taken against Plains Supply Company. S. E. Davis and D. D. Davis, herein known as Davis Brothers, brought this appeal.

At the time of the execution of the equipment lease by Misco Leasing, Inc., herein known as "Misco," the Davis Brothers were engaged in a farming operation in Lubbock County, Texas, on land leased by D. D. Davis from Edwin L. Forrest. The farm lease contained a requirement that the lessee provide a minimum of two irrigation sprinkler systems on the land. In order to comply with the farm lease provisions, the Davis Brothers contacted Dale Brown of Plains Supply Company in Lubbock, whereupon Brown placed two such irrigation systems on the leased premises. At the time the systems were placed on the land, the Davis Brothers made no arrangements with Brown to pay for equipment. Dale Brown was requested by D. D. Davis, and Brown agreed, to arrange for financing of the purchase price of the equipment. Brown agreed that if he was unable to arrange for financing, Plains Supply would finance the purchase. These particular sprinkler systems were the first of a line and Dale Brown was interested in placing them on the land leased by the Davis Brothers in order to have a working system available for display to potential customers.

The leasing arrangement involved here is the method Dale Brown chose to finance the transaction. Misco had previously furnished lease application forms to Plains Supply which, in this instance, were filled out by Dale Brown. E. R. McGee, Misco's representative in Lubbock, picked up the application from Brown and forwarded it to the Wichita, Kansas office of Misco Leasing, Inc.

The normal procedure in such a leasing arrangement is for the lessee to select the equipment of his choice from a supplier. A lease application is then sent to the' lessor, who runs a credit check on the applicant to determine whether the transaction is feasible. If the lessor desires to enter into the arrangement, it then purchases the equipment from the supplier and executes a lease agreement with the lessee.

In the instant case, when Misco received the application from E. R. McGee, it ini-

tially determined that it would not be feasible to enter into the arrangement with the Davis Brothers. However, upon execution of a written guaranty agreement between Plains Supply and Misco, whereby Plains Supply guaranteed the payment of the Davis Brothers' obligations thereunder, Misco decided to enter into the lease agreement.

On April 12, 1968, D. D. Davis and S. E. Davis signed the agreement. It is undisputed that neither of them read the instrument before or after they signed it. The terms of the lease indicated that the equipment, with a total cost of $15,000, was being leased to Davis Brothers for an initial term of sixty months. It provided for twenty quarterly payments of $1,023.75 plus a security deposit of $3,071.25. The lease could be renewed at the end of the initial term for a renewal premium of $450 per year.

The agreement was signed by a representative of Misco on April 18, 1968 and on May 2, 1968, an executed copy thereof was mailed to the Davis Brothers, along with a letter, signed by Melvin Pankratz, credit manager of Misco, which contained the following language:

"This agreement includes a clause providing for renwal (sic) of the lease after its initial term, at an annual rental of $450.00, payable each year in advance on its anniversary date. In the event you should wish to purchase this Irrigation System, however, you may do so for its fair market value at that time, but not to exceed ten percent of its original total price."

Misco then sent a check for $15,000 to Plains Supply in payment for the equipment. Prior to this, however, Dale Brown had sent to Misco a check in the total sum of $4,095, representing the required security deposit of $3,071.25 plus the first quarterly rental of $1,023.75. The Davis Brothers knew nothing of this payment, but Melvin Pankratz testified that such procedure was not uncommon. Dale Brown testified that the purpose of this payment was to compensate the Davis Brothers for the inconvenience in the event Brown had to interrupt their watering cycle to show the system to prospective customers.

The Davis Brothers used the equipment for two years, whereupon they lost their lease on the Forrest land, left the sprinkler systems on the land, and ceased making payments to Misco. Thereafter, at the direction of Misco, Dale Brown had a notice of private sale printed in a Lubbock newspaper, stating that bids for the purchase of the systems would be accepted at the Wichita, Kansas office of Misco no later than April 12, 1970, and that the sale would be held on April 15, 1970. A single bid of $4,000 was received from, and the equipment was sold to, Dean Chenoweth of Haviland, Kansas.

This suit was brought by Misco to recover the amount of the deficiency claimed to be owing under the agreement. Plaintiff's petition alleged a total debt of $21,975, with allowable credits in the total sum of $10,142.50, consisting of $6,142.50 in lease payments received by Misco, plus $4,000 received from the sale of the equipment to Chenoweth, leaving a deficit of $10,332.50. After trial without a jury, judgment was awarded to Misco for the sum of such deficit, interest in the amount of $3,960.80, attorney's fees in the amount of $2,000, together with legal interest on such judgment from the date thereof. From such judgment Davis Brothers have brought this appeal asserting eleven points of error.

Basically, an examination of the trial court's judgment and the findings of fact and conclusions of law reveals that the trial court regarded the transaction strictly as a lease, rather than a security interest subject to the Texas Business and Commerce Code (UCC). We have examined all of appellants' assignments of error, including the various aspects of their complaints and objections regarding the trial

court's findings of fact and conclusions of law and the refusal of the court to make appellant's requested findings concerning the "lease—security interest" questions, as well as their contentions that this transaction is subject to the provisions of the UCC, the state usury laws and prohibitions against unauthorized penalties and forfeitures. We have concluded that the focal issue in this appeal is whether there is adequate evidentiary support for the court's judgment impliedly finding that the agreement and transaction forming the basis of this suit was a lease that did not create a security interest subject to the provisions of the Uniform Commercial Code. Specific challenges of the evidentiary support for the court's judgment are found in appellants' seventh point of error wherein they urge that the trial court erred in its conclusion of law that "BASED UPON THE EVIDENCE PRESENTED" the plaintiff was entitled to the specific judgment entered against Davis Brothers for the reasons that the judgment is not supported by proper findings of fact, and that there is no evidence and there is insufficient evidence to support the findings of fact upon which the conclusion of law is based. Also, the appellee takes the basic position that the transaction was a lease not subject to the UCC and that the appellants' complaints regarding the application of the UCC and usury laws need not be reached.

In appellants' points of error one and two, it is contended that the trial court erred in refusing defendant's request for conclusions of law (1) that the option to purchase after the lease term was for a nominal consideration, and thereby created a security interest as a matter of law under the Texas Business and Commerce Code (UCC) and (2) that under the facts of this case the parties intended the lease to be "as security" under the Uniform Commercial Code. Implicit in these points of error is the complaint that the trial court erred in its implied finding that the consideration for the option to purchase was not nominal and that the parties did

not intend the lease "as security." Thus, the basic issue was joined. The appellants challenged the judgment based on the court's implied finding and legal conclusion that under the evidence the transaction was a lease not subject to the UCC by urging, in negation thereof, their counter contentions that the evidence supports a conclusion that the agreement was one intended to create a security interest, thereby coming within the meaning of Article 9 of the Texas Business and Commerce Code, V.T.C.A.

Appellants rely on Tex.Bus. & Commerce Code § 1.201(37) in support of their proposition that Article 9 of the Code (UCC) applies here. The pertinent portions of that section are:

"'Security interest' means an interest in personal property or fixtures which secures payment or performance of an obligation. . . . Whether a lease is intended as security is to be determined by the facts of each case; however, (A) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (B) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security."

The recent Oregon Supreme Court case of Peco, Inc. v. Hartbauer Tool & Die Co., 500 P.2d 708 (Sup.Ct.—Oregon, 1972) dealt with a similar equipment lease, and with a statute identical in wording to Section 1.201(37) of the Tex.Bus. & Commerce Code here under consideration. In construing the statute the Court said:

"At first glance the provisions of the above section may be somewhat confusing, probably because they are stated in the inverse order of importance. However, upon a careful reading of the entire section it is clear that the first question to be answered is that posed by

clause (b)—whether the lessee may obtain the property for no additional consideration or for a nominal consideration. If so, the lease is intended for security. If not, it is then necessary to determine 'by the facts of each case' whether the lease is intended as security and, in making that determination, the fact that the lease contains an option to purchase 'does not [of itself] make the lease one intended for security.' "

In the light of this recommended procedure, we shall consider the question of the option to purchase and whether it could be exercised for a nominal consideration.

■ In the instant case, the instrument denominated as the lease did not contain the option to purchase. It was instead, as previously mentioned, included in a letter sent to the Davis Brothers some three weeks after the lease agreement was entered into, accompanied by an executed copy of the agreement. Section 1.201(37) of the Business and Commerce Code makes no requirement that the option to purchase be in the body of the lease contract. The letter extending the option to purchase to the Davis Brothers is sufficiently identified as being applicable to the lease agreement involved here. The original lease instrument contains a provision for addition or alteration of the agreement so long as it is embodied in a "writing, signed and made a part hereof by an authorized officer of lessor." The letter sent to the Davis Brothers, extending to them the purchase option, was signed by Melvin Pankratz, credit manager of Misco Leasing. The letter merely contained consistent additional terms by which the lessee was given an option to purchase the equipment. We must, therefore, look to the lease as modified by the letter to determine whether the transaction was one intended for security. In re Virginia Air Conditioning Co., Inc., 11 UCC Rep. 1260 (U.S.Dist.Ct.W.D.Va., 1972).

■ The primary area of inquiry deals with whether the consideration for the exercise of the purchase option is nominal or substantial. The Peco case, supra, sets out, in our opinion, a reasonable rule relative to the determination of this matter. That case stated the rule as follows:

"We agree that the best test is a comparison of the option price with the market value of the equipment at the time the option is to be exercised. Such a comparison shows whether the lessee is paying actual value or acquiring the property at a substantially lower price."

See, also, In re Crown Cartridge Corp., 220 F.Supp. 914 (S.D.N.Y., 1962); In re Oak Manufacturing, Inc., 6 UCC Rep. 1273 (S.D.N.Y., 1969); In re Universal Medical Services, Inc., 8 UCC Rep. 614 (E.D.Pa., 1970); Uniroyal, Inc. v. Michigan Bank, N.A., 12 UCC Rep. 745 (Mich.Cir.Ct. 1972). Another test commonly applied to determine if the purchase option is exerciseable for nominal consideration is whether or not the terms of the option are such as to leave the lessee with no sensible alternative but to exercise the option. In re Vaillancourt, 7 UCC Rep. 748 (U.S.D. Ct.Maine, 1970). Both of the foregoing tests require some evidence indicative of the fair market value of the equipment at the time the lessee would be entitled to exercise the option. The record contains no evidence of such nature whereby either of such tests could be properly applied. Thus, we are unable to determine whether or not the option price is nominal.

■ Since we have determined that the "nominal consideration" test cannot be applied herein, under the holding of the Peco case, we must now look to the actual intent of the parties to ascertain whether the purported lease agreement was intended "as security." The mandate of the Texas Business and Commerce Code, as well as the case law, is that we must determine the parties' intent in the light of the facts and circumstances of each case. Tex.Bus. & Commerce Code, § 1.201(37); In re Transcontinental Industries, Inc., 3 UCC Rep. 235 (N.D.Georgia, 1965); In re Walter

W. Willis, Inc., 313 F.Supp. 1274 (N.D. Ohio, 1970); John Deere Co. v. Wonderland Realty Corp., 38 Mich.App. 88, 195 N.W.2d 871 (1972). Also, the substance of the document rather than mere formality of wording must be examined to determine whether the transaction involved a lease, a conditional sale, or a security interest. In re Gresham, 311 F.Supp. 974 (E.D.Virginia, 1970); John Deere Co. v. Wonderland Realty Corp., supra; Transamerica Leasing Corp. v. Bureau of Revenue, 80 N.M. 48, 450 P.2d 934 (1969); In re Walter W. Willis, Inc., supra.

In re Transcontinental Industries, Inc., supra, a case quite similar factually to the instant case, enumerated a number of characteristics of the lease agreement and arrangements between the parties which indicated to the court that the actual intent of the parties was that the transaction was intended "as security." Among those characteristics or provisions which are similar to those involved in the instant lease are: (1) the lessor's purchase of the equipment from a supplier; (2) the lessor's requirement of a guaranty or indemnity agreement executed by a third party; (3) payment of all taxes, insurance and expenses for repairs by the lessee; and (4) payment of a substantial security deposit by the lessee. Other similarities are demonstrated by the following statements set out in the Transcontinental Industries, Inc., case:

"Upon termination of the lease period the lessee was given the first opportunity to purchase the equipment or it might renew for a rental of 2% of the cost per year . . . . there was no evidence of the handling of any volume of equipment by USLC. . . . No storage facilities or handling procedures were described. From this it may be conjectured that at termination of the leases the property for the most part was retained by the lessees, either through purchase or exercise of rental renewal option.

"From all of these attending facts and circumstances it would appear that the lessee had no design other than to obtain the equipment and have some one finance its costs. USLC had no property to lease and had its concern only on supplying and financing at a profitable rate of earning and to be surely secure in its doing."

In response to the appellants' discussion of the Transcontinental Industries case in their brief, the appellee refers to an article contained in law review notes appearing in 47 Notre Dame Lawyer, 993, 1001 (April, 1972), wherein in commenting on the results reached in that particular case it was stated: "Unfortunately, this pragmatic approach is the exception, not the rule." From an examination of the article entitled "RECORDING OF EQUIPMENT LEASES: A PROPOSED AMENDMENT TO THE UNIFORM COMMERCIAL CODE," we note that considerable emphasis was placed upon difficulties in discerning between a sale and a lease because of the prevalence of what is called "third party leasing." "Under such an arrangement, the lessor is actually a financial institution which acquires the equipment from a supplier for the specific purpose of filling the needs of the prospective lessee. The article is shipped directly to the lessee with the lessor never handling it. The lessor recoups his investment, plus interest, from the rental paid by the lessee under a long-term lease, often with an option to purchase."

The changes proposed by the article would bring leases of industrial and commercial equipment within the scope of Article 9 of the Uniform Commercial Code regardless of whether they are intended as security. Such changes are designed to eliminate the problems in making the *factual determinations* as to whether a "lease" is intended as security rather than a true lease.

Although the "pragmatic" approach in reaching the result in the Transcontinental case may be regarded as the exception rather than the rule, it is our opinion that the characteristics of the arrangements dis-

cussed in that case, although not necessarily determinative of the parties' intent, may be properly considered, along with the other facts and circumstances bearing on such intent.

■ The case of In re Alpha Creamery Co., Inc., 4 UCC Rep. 794 (W.D.Mich., 1967) establishes certain guidelines which indicate that the character of a transaction is a true lease rather than one intended as security. The indicators are as follows:

"(a) Provision specifying purchase option price which is approximately the market value at the time of the exercise of the option.

"(b) Rental charges indicating an intention to compensate lessor for loss of value over the term of the lease due to aging, wear and obsolescence.

"(c) Rentals which are not excessive and option purchase price which is not too low.

"(d) Fact showing that the lessee is acquiring no equity in leased article during the term of lease."

In the above mentioned article in 47 Notre Dame Lawyer, reference was made to the problems recognized by the accounting profession in making factual determinations in connection with proper accounting for equipment leases. The article specifically mentioned Opinion No. 5, "Reporting of Leases in Financial Statements of Lessee" issued by the Accounting Principles Board of the American Institute of Certified Accountants, issued in September, 1964, wherein it was pointed out that the standard for distinguishing between lease and sale is the presence of terms which create in the lessee a "material equity" in the property. It was further noted that the inclusion in the lease of either of the following features will usually establish this factor:

"a. The initial term is materially less than the useful life of the property, and the lessee has the option to renew the lease for the remaining useful life of the property at substantially less than the fair rental value; or

"b. The lessee has the right, during or at the expiration of the lease, to acquire the property at a price, which at the inception of the lease appears to be substantially less than the probable fair value of the property at the time or times of the permitted acquisition by the lessee."

The guidelines above set out are, in our opinion, reasonable for consideration in connection with the factual determinations as to whether a particular transaction between parties is a true lease or one intended as security. However, in order to apply such guidelines, it is necessary that the record contain evidence of the fair market value of the equipment at the time the purchase option may be exercised; evidence of the depreciation schedule and anticipated useful life of the equipment; and evidence as to whether the rental payments are indicative of customary rental rates for similar equipment or are indicative of an acquisition of equity in the equipment. The lack of evidence of this nature in the record makes it impossible to apply such guidelines. Thus, the absence of essential evidence precludes either a legal conclusion or a factual determination of the true character of the agreement on which the transaction was based.

■ From a review of the record, we find the evidence was insufficient to support the implied findings and the judgment based thereon that the transaction was a lease not subject to UCC requirements. Likewise, we find that the record will not support the appellants' contention that the evidence establishes as a matter of law that the agreement in question created a security interest. We hold, therefore, that by reason of the lack of necessary evidentiary support on the basic issue, the court erred in rendering the judgment based upon its implied finding as to the nature of the transaction. Thus, the judgment al-

lowing appellee's recovery cannot be permitted to stand and should be reversed and remanded to enable the parties to more fully develop the essential evidentiary matters relating to the controlling issue. In view of the remand, discussion of the remaining points of error, dependent upon resolution of the character of the agreement in question, is pretermitted.

Accordingly, it is our opinion that the rights of the parties should not be foreclosed under the present state of the record, and in the interest of justice, the judgment is hereby reversed and the cause remanded.