**STATE BANK OF BURLEIGH COUNTY TRUST COMPANY, Plaintiff and Appellee,**

v.

**ALL–AMERICAN SUB, INC., Jerome R. Jekel, and Joseph O. Skaff, Defendants,**

and

**David C. Garner and Roger Hardy, Defendants and Appellants.**

**Civ. No. 9641.**

Supreme Court of North Dakota.

Feb. 14, 1980.

Richard P. Rausch, of Rausch & Rausch, Bismarck, for plaintiff and appellee.

Chapman & Chapman, Bismarck, for defendants and appellants; argued by Charles L. Chapman.

VANDE WALLE, Justice.

David C. Garner and Roger Hardy appeal from a judgment entered by the Burleigh County district court on March 6, 1979, for the State Bank of Burleigh County Trust Company ("Bank") and against All-American Sub, Inc., David C. Garner, Jerome R. Jekel, Joseph O. Skaff, and Roger Hardy in the sum of $25,469.84. We affirm.

Garner and Hardy were guarantors[1] on five leases entered into by the Bank as lessor and All-American Sub, Inc., as lessee in 1976. The leases covered and concerned personal property generally identified as restaurant equipment and signs. Because the leases have identical terms we hereinafter refer to them collectively as "the lease" or "the agreement."

In December of 1977, after receiving the monthly payment required under the lease, the Bank was informed that All-American Sub had abandoned the leased equipment and closed its various restaurant outlets. The Bank made arrangements to have the leased property removed and stored. Notice of default was given to Garner and Hardy, as guarantors; thereafter, the property was either sold or credit was given to All-American Sub and the guarantors by the Bank.

The Bank sued All-American Sub and the guarantors for the amount owing on the lease. The district court granted the Bank judgment for deficiency against All-American Sub and the guarantors, jointly and severally, for the amount due and owing on the lease plus costs. Garner and Hardy, as guarantors, now appeal from this judgment.

On this appeal we consider the following issues:

1. Whether or not the Bank has the right to accelerate the payments due upon default.

2. Whether the lease entered into by the Bank and All-American Sub, Inc., was intended as a "true" lease or as "security" within the meaning of Section 41–01–11(37), N.D.C.C.

3. Whether or not Garner and Hardy, as guarantors, are entitled to notification of the intended disposition of the repossessed equipment.

4. If notification is required, what is the effect of failing to give such notice?

I

Our first consideration is whether or not the Bank had the right to accelerate the payments due upon default. There can be no doubt that All-American Sub was in default. By the terms of the agreement itself the company was in default when it failed to pay the rent when due; in addition, there was evidence that All-American Sub had abandoned its restaurant outlets. However, Garner and Hardy contend that by the terms of the guaranty they promised only the "payment of all sums due thereunder in event of default," which they assert is only one monthly payment, and even that one was eventually paid by All-American Sub president Mr. Jekel. We do not agree with that contention.

Paragraphs 11 and 12 of the lease provide:

"11. *DEFAULT:* Owner-Lessor may terminate this Lease at any time without notice and take possession of the equipment if Lessee shall:

"A. Fail to pay when due any rent or amounts required to be paid to Owner-Lessor by Lessee.

"B. Fail to perform any other provision hereof within ten (10) days after Owner-Lessor shall have demanded performance.

"C. Suffered a receiver to be appointed for its assets.

---

1. The guaranty provision of the leases states:
 "Undersigned guarantees performance of above lease by Lessee and payment of all sums due thereunder in the event of default, hereby waiving any notification, amendment or extension and notice thereof."

"D. If any proceedings in bankruptcy, receivership or insolvency shall be commenced against Lessee or its property or if Lessee makes an assignment for the benefit of its creditors.

"E. If any credit information submitted by Lessee to Owner-Lessor to induce Owner-Lessor to enter into this Lease or any other information submitted at any time by Lessee to Owner-Lessor be not true in any material respect.

"12. In the event of default, Owner-Lessor shall have the right, but shall not be obligated to exercise any one or more of the following remedies:

"A. Lessee shall, if requested by Owner-Lessor purchase the equipment at a price determined by multiplying the monthly rental charge by the remaining months of the Lease and adding thereto any delinquent rentals, other amounts due Owner-Lessor the salvage value of the equipment and prepaid expenses incurred by Owner-Lessor, including but not limited to sales or use tax, insurance premiums, and subtracting from the total thereof any unearned leasing charges.

"B. Owner-Lessor may sell the equipment or obtain a cash bid therefor from a dealer in the same type of equipment leased hereunder. If sold, the sale may be public or private, with or without notice to Lessee, and at wholesale. If the net proceeds of the sale (gross proceeds less direct expenses of Owner-Lessor in preparing and holding the equipment for sale, sales commissions, selling expenses and attorney's fees) or the cash bid from a dealer are less than the amount owing as determined in the preceding paragraph, such deficiency shall constitute a part of Owner-Lessor costs and shall be forthwith paid by the Lessee. Repossession and sale of the equipment shall not affect Owner-Lessors rights to recover any damages from Lessee and Owner-Lessors rights and remedies in the event of any breach, termination or expiration of this Lease shall not be deemed exclusive but shall be cumulative and in addition to the rights and remedies in Owner-Lessor's favor existing by law or this Lease."

██ We believe that paragraph 12 of the lease provides for the acceleration of payment so that upon default the total accelerated payments under the leases are sums due for which Garner and Hardy as guarantors are liable under their guaranty. Nor do we find that the Bank waived any right to foreclose upon default because it accepted payment by Jekel on the underlying debt. As observed by the Michigan Court in *Gorham v. Denha*, 77 Mich.App. 264, 258 N.W.2d 196 (1977):

"Although defendants have made their monthly payments, they have not tendered the entire balance of the debt owing. They have not redeemed the collateral and there is nothing in the UCC that would bar plaintiff from accepting installment payments to reduce the total amount owed while proceeding with foreclosure." 77 Mich.App. at 270, 258 N.W.2d at 200, n. 3.

II

The issue of whether or not a lease is intended as security within the meaning of U.C.C. § 1–201(37)[2] has been considered by courts in many jurisdictions. *Uniroyal, Inc. v. Michigan Bank, N.A.*, 12 UCC Rep.Serv. 745 (Mich.1972); *TransAmerica Leasing Corp. v. Bureau of Revenue*, 80 N.M. 48, 450 P.2d 934 (1969). However, we believe this issue to be one of first impression before this court.

██ The Bank contends that Garner and Hardy conceded that the agreement was a lease when they admitted allegations in the Bank's complaint using the term "lease." We do not agree. The allegations that Garner and Hardy admitted only set forth un-

2. This section, codified at § 41–01–11(37), N.D. C.C., provides, in part:

"37. 'Security interest' means an interest in personal property or fixtures which secures payment or performance of an obligation. . . . Whether a lease is intended as security is to be determined by the facts of each case; . . . ."

contested facts. Because the guarantors admitted allegations in which the agreement was termed a "lease" does not, as we discuss later, necessarily mean that it will be construed as a lease.

It is unclear from a review of the record whether the district court found this to be a true lease or a lease intended as security. The district court did find that after default the property was either sold or credit was given in a commercially reasonable manner, which shows a consideration of factors relevant to a secured transaction under U.C.C. Article 9, as codified in Chapter 41–09, N.D.C.C. But there was no expressed finding by the court that this lease was intended as security. Section 41–01–11(37), N.D.C.C., provides, in part, "Whether a lease is intended as security is to be determined by the facts of each case; . . ." This would seem to indicate that whether the parties intended a true lease or one intended as security is a question for the finder of fact. Such a view has been adopted by courts in some jurisdictions which have statutes similar to Section 41–01–11(37). *Burns v. Equilease Corp.*, 357 So.2d 786 (Fla.App.1978); *Granite Equipment Leasing Corp. v. Acme Pump Co., Inc.*, 165 Conn. 364, 335 A.2d 294, 13 UCC Rep. Serv. 707 (1973). However, we believe the better view is expressed in *Percival Construction Co. v. Miller & Miller Auctioneers*, 532 F.2d 166 (10th Cir. 1976). There, the Circuit Court in discussing an Oklahoma statute similar to 41–01–11(37), N.D.C.C., stated the intent of the parties is a determinative fact in deciding whether or not a lease is intended as security and that this intent, when the lease is unambiguous, is to be determined from within the four corners of the writing as a question of law. This view is in accord with *Tallackson Potato Co., Inc. v. MTK Potato Co.*, 278 N.W.2d 417 (N.D.1979), wherein we stated:

"If the parties' intentions in a written contract can be ascertained from the writing alone, then the interpretation of

the contract is a question of law for the court to decide." 278 N.W.2d at 422.

In the case at hand, we believe the parties' intent can be ascertained from the written agreement alone. Our belief is supported by Paragraph 13–H of the agreement, which states:

"This Lease contains the entire agreement between the parties and embodies any oral representations, negotiations or agreements made in connection herewith." [3]

Thus the interpretation of the agreement is a question of law for this court and we are not bound under N.D.R.Civ.P. 52(a) by any findings of fact, or lack of findings, on the part of the district court as to what the parties intended by the agreement.

The agreement under consideration is referred to as a "lease" and the parties as "lessor" and "lessee." Paragraph 13–A specifically provides:

"This agreement is a Lease and not a security agreement, . . ."

The Bank contends that this shows the parties intended a true lease and not a lease intended as security. It is true that some courts have given some weight to what the parties have chosen to denominate themselves in agreements [*Gibreal Auto Sales, Inc. v. Missouri Valley Mach. Co.*, 186 Neb. 763, 186 N.W.2d 719 (1971); *Witmer v. Kleppe*, 469 F.2d 1245 (4th Cir. 1972)], but we do not find these denominations to be conclusive proof that a lease was not intended as security. In *Lee v. North Dakota Park Service*, 262 N.W.2d 467, 474 (N.D. 1978), this court stated, in discussing whether an agreement was a license or a lease: "The title of an instrument is not controlling." *And see Lease Finance, Inc. v. Burger*, 575 P.2d 857 (Colo.App.1977); *Davis Brothers v. Misco Leasing, Inc.*, 508 S.W.2d 908, 76 A.L.R.3d 1 (Tex.Civ.App.1974); *John Deere Co. v. Wonderland Realty Corp.*, 38 Mich.App. 88, 195 N.W.2d 871 (1972).

---

3. For a similar conclusion see *In re Wheatland Electric Products Co.*, 237 F.Supp. 820 (W.D. Pa.1964). *But see Citizens & Southern Equip.* *v. Atlantic Fed. S & L*, 144 Ga.App. 800, 243 S.E.2d 243 (1978).

■ Nor do we find the provision of the agreement authorizing the lessee to file a financing statement to be conclusive proof that the lease was intended as security. Under Section 41–09–46.2, N.D.C.C., the filing of a financing statement "shall not of itself be a factor in determining whether or not the . . . lease is intended as security . . ." See *Rollins Com. v. Georgia Inst. of Real Estate*, 140 Ga.App. 448, 231 S.E.2d 397 (1976); *Matter of Delta Molded Products, Inc.*, 416 F.Supp. 938 (N.D.Ala.1976).

■■ Whether or not the parties intended to create a security interest requires the consideration of factors in addition to the labels used and the filings made. In *Davis Brothers v. Misco Leasing, supra*, the Texas Court of Appeals enumerated certain characteristics which when found in a lease agreement indicate that the parties intended the lease as security. Among these are: "(1) the lessor's purchase of the equipment from a supplier; (2) the lessor's requirement of a guaranty or indemnity agreement executed by a third party; (3) payment of all taxes, insurance and expenses by the lessee; and (4) payment of a substantial security deposit by the lessee." 508 S.W.2d at 913, 76 A.L.R.3d at 8. Other indicators found in *Davis Brothers* that show a transaction was intended as security are: (5) opportunity for the lessee on termination of the lease to purchase the equipment or to renew the lease at a minimal rent; (6) lack of evidence showing the lessor handled any volume of equipment; and (7) absence of storage facilities or handling procedures by the lessor.

■ In the case at hand, the lease provided:

"1. *SELECTION OF EQUIPMENT AND SUPPLIER*: Lessee has selected the equipment and the supplier. Owner-Lessor agrees to order the equipment from the supplier . . .

"7. *SECURITY DEPOSIT*: Any security deposit may be applied, at the option of the Owner-Lessor, toward the payment of any amounts due from Lessee to Owner-Lessor arising from this Lease or any other transaction, including but not limited to rental and amounts owing by reason of Lessee's failure to procure insurance, repair damage to the equipment, pay taxes or restore the equipment to good condition on termination of the Lease.

"9. *INSURANCE*: Lessee, at its expense, shall provide and maintain insurance for fire . . ., bodily injury and property damage liability insurance . . .

"13. *GENERAL PROVISIONS*:
"A. . . .
"B. Lessee shall pay all license fees, personal property taxes, excise taxes, rental taxes, sale and use taxes and all other taxes now or hereafter in effect during the term of this Lease, . . ."

All-American Sub's lease also required a guaranty by third parties of the lessee's performance. In addition, All-American Sub had the option to renew the lease after the initial term at a yearly rate which was substantially reduced from that required during the initial period. The right to renew at a substantially reduced rate after the initial lease term was also seen as supporting a finding that the parties intended the lease as security in the cases of *Leasco Data Proc. Equip. Corp. v. Starline O. Corp.*, 74 Misc.2d 898, 346 N.Y.S.2d 288, 12 UCC Rep.Serv. 1214 (1973), and *In re Pomona Valley Inn* (U.S.Dist.Ct., C.D.Calif.1967), although a contrary view is expressed in *In re Telemax Corp.*, 12 UCC Rep.Serv. 742 (U.S. Dist.Ct., S.D.N.Y.1973).

There is also no evidence in the record that the Bank handles any volume of equipment. It is true, as the Bank contends, that under Section 6–03–59.1, N.D.C.C.,[4] a bank

4. Section 6 03 59.1, N.D.C.C., provides:
"A bank may become the owner and lessor of personal property upon the specific re-

quest of and for the use of a customer. The term of the lease shall not exceed twenty

may become the owner and lessor of personal property upon the specific request of and for the use of a customer; but this is still considered part of its financing business, as evidenced by the inclusion of the lease obligations in determining the maximum amount that an individual may borrow from a bank. Sec. 6–03–59.1, N.D.C.C. Nor is there any indication that the Bank had facilities for storing the equipment or procedure for handling it. As the record shows, the Bank contracted with Jet Sales, Inc., a food wholesaler, to remove and store the equipment.

 Other provisions found in the agreement which have been held to indicate an intent to create a security interest are: Lessee bears the risk of loss [*Uniroyal, Inc. v. Michigan Bank N.A., supra*]; rent to be paid equals the cost of the equipment plus interest [*In re Transcontinental Industries, Inc.*, 3 UCC Rep.Serv. 235 (U.S.Dist.Ct., N.D.Ga.1965)]; and upon default lessee is liable for the total rent unpaid plus any deficiency resulting from his sale of the equipment for less than the amount owing [*Computer Science Corp. v. Sci-Tek, Inc.*, 367 A.2d 658 (Del.Super.1976)].

 In view of the factors discussed above, we conclude that the Bank and All-American Sub intended the lease as "security" within the meaning of Section 41–01–11(37), N.D.C.C.

### III

Because the parties intended the lease to create a security interest in personal property, we must, under Section 41–09–02(1)(a), N.D.C.C., consider the rights and responsibilities of the parties in light of all the provisions of Chapter 41–09, N.D.C.C., specifically those provisions dealing with rights and responsibilities upon default.

Section 41–09–50, N.D.C.C., provides:

"1. A secured party after default may sell, lease, or otherwise dispose of any or all of the collateral . . .

"2. . . .

"3. Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms, but every aspect of the disposition, including the method, manner, time, place, and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, if he has not signed after default a statement renouncing or modifying his right to notification of sale. . . ."

 In June of 1978 counsel for the Bank wrote to Garner and Hardy's attorney and asked if he had any objections to the Bank's selling the repossessed equipment. No response was made to this letter and some of the equipment was eventually sold. The letter was not introduced into evidence by the Bank to show notice of intended disposition but was alluded to in its post-trial brief. Garner and Hardy admitted that the letter was received and attached a copy to their reply brief. In their reply brief Garner and Hardy argue that they, as guarantors, did not receive notice and, more important, neither did All-American Sub, the principal debtor. The district court made no finding on whether or not this letter was sufficient notice to the guarantors and neither do we. However, for purposes of this opinion we proceed as if the letter was not sufficient notice. The lease

---

years and all such leases shall provide for the payment of at least annual rentals, the total of which shall at least equal the cost to the bank of the personal property so leased. The

total leasing obligation or rentals to a bank will be a part of the total liability limitations of any borrower as set forth in section 6–03–59."

entered into by the Bank and All-American Sub states that sale may be made with or without notice to the lessee, but this provision is not controlling. Under Section 41–09–07, N.D.C.C., the right of the debtor to receive notice of intended disposition cannot be waived by the debtor prior to default. *Accord, Stensel v. Stensel*, 63 Ill.App.3d 639, 20 Ill.Dec. 548, 380 N.E.2d 526 (1978); *Lowe v. Termplan, Inc.*, 144 Ga.App. 671, 242 S.E.2d 268 (1978); *Marine Midland Bank-Central v. Watkins*, 89 Misc.2d 949, 392 N.Y. S.2d 819 (1977).

However, Garner and Hardy are guarantors and not the principal debtors. We therefore must consider whether or not they, as guarantors, have the same non-waivable right to notice as the principal debtors. If the guarantors do not have a nonwaivable right, then the waiver provision found in the lease may be applicable to them.

Our research reveals there is a split of authority on the question. One view, as expressed in *First Nat. Park Bank v. Johnson*, 553 F.2d 599 (9th Cir. 1977), is that a guarantor has the same right to notice of intended disposition as the principal debtor, but that the guarantor may waive this right. This view is based upon the assumption that U.C.C. § 9–501(3) [Section 41–09–47(3), N.D.C.C.] applies only to "debtors" and that guarantors are not "debtors" within the meaning of that section. Secondly, it is argued that the policy reasons for disallowing waiver of notice by debtors do not apply to guarantors.

Another view, as expressed in *Barnett v. Barnett Bank of Jacksonville, N.A.*, 345 So.2d 804 (Fla.App.1977), is that a guarantor is a debtor for purposes of U.C.C. § 9–501(3); thus notice of intended disposition may not be waived by a guarantor, either. *Accord, Zions First Nat. Bank v. Hurst*, 570 P.2d 1031 (Utah 1977); *DeLay First Nat. B. & Tr. v. Jacobson Appliance*, 196 Neb. 398, 243 N.W.2d 745 (1976). Support for this view is found in U.C.C.

§ 9–105(1)(d) [Section 41–09–05(1)(d), N.D. C.C.], which states:

"d. 'Debtor' means the person who owes payment or other performance of the obligation secured, . . ."

Under this definition it would seem logical to include guarantors, who by their very nature are obligated to pay or perform in the event of the principal debtor's default. See § 22–01–01(1), N.D.C.C.

We make no decision today on whether or not a guarantor may waive notice of intended disposition of repossessed goods prior to default. However, for purposes of this discussion, we assume that the guarantor could not waive his right to notice.

IV

If we assume the guarantors could not waive notice of intended disposition we must consider what is the effect of the Bank's failure to give such notice. We believe this issue is also one of first impression before this court. Examination of decisions in other jurisdictions reveals two conflicting lines of authority.[5] One line, as expressed in *Bank of Gering v. Glover*, 192 Neb. 575, 223 N.W.2d 56 (1974), holds that failure to give notice of intended disposition precludes the recovery of a deficiency judgment. Under this view the giving of notice is seen as an absolute condition precedent to the recovery of any deficiency. *Accord, Stensel v. Stensel, supra; Barnett v. Barnett Bank of Jacksonville, N.A., supra; Herman Ford-Mercury, Inc. v. Betts*, 251 N.W.2d 492 (Iowa 1977); *Atlas Thrift Co. v. Horan*, 27 Cal.App.3d 999, 104 Cal.Rptr. 315, 59 A.L. R.3d 389 (1972).

The other line, as expressed in *Levers v. Rio King Land & Inv. Co.*, 93 Nev. 95, 560 P.2d 917 (1977), holds that a creditor's misconduct is not an absolute bar to deficiency. Instead, it will be presumed the collateral had a fair market value equal to the amount of the debt and no deficiency will be allowed unless the creditor overcomes this presumption by producing evidence that the fair market value of the collateral

5. See, generally, 1A · Bender's *Uniform Commercial Code Service* § 8.6(2) at 933 (1975); Annot., 59 A.L.R.3d 401 (1974); White & Sum- mers *Uniform Commercial Code* § 26–15 at 1000 (1972); and the cases discussed therein.

**780**

was less than the outstanding debt. *Accord, United States v. Whitehouse Plastics,* 501 F.2d 692 (5th Cir. 1974), *cert. denied* 421 U.S. 912, 95 S.Ct. 1566, 43 L.Ed.2d 777; *Conti Causeway Ford v. Jarossy,* 114 N.J. Super. 382, 276 A.2d 402 (1971); *Universal C. I. T. Credit Co. v. Rone,* 248 Ark. 665, 453 S.W.2d 37 (1970).

■■■ We believe the second line of cases expresses the better rule.[6] As observed by the New Jersey Court in *Conti Causeway Ford, supra,*

"In the situation where reasonable notice of sale has not been given, the spirit of commercial reasonableness requires that the secured party not be arbitrarily deprived of his deficiency but that the burden of proof be shifted to him to prove that the sale resulted in the fair and reasonable value of the security being credited to the debtor's account. When that burden has been borne, the resultant deficiency ought to be collectible by the secured party, especially in view of the rights to damages afforded the debtor by N.J.S.A. 12A:9–507."[7] 114 N.J.Super. at 386, 276 A.2d at 404–405.

It is especially evident that the second view is more in the spirit of commercial reasonableness when it is considered that the guarantors were businessmen dealing at arm's length with the Bank. They had even approached the Bank with plans to continue the operation of the restaurant outlets. To allow these businessmen to avoid liability because of the Bank's failure to comply with Section 41–09–50, N.D.C.C., where there has been no harm alleged or shown would not be in keeping with the spirit of commercial reasonableness.

■■■ Because we believe the better view to be that failure to give notice shifts

to the secured party the burden of proving the sale resulted in the fair and reasonable value of the property being credited to the debtor's account, we must look to the record to see if the Bank has met this burden. It was the finding of the district court that the property was either sold or credit was given to the lessee and guarantors in a commercially reasonable manner. This is essentially a factual question. *United States v. Conrad Publishing Co., supra.* Therefore, the finding of the district court will not be set aside unless it is found to be clearly erroneous. N.D.R.Civ.P. 52(a).

The record reveals that the Bank made a complete inventory of the equipment repossessed. One of its officers then met with one of the principals of Jet Sales to appraise the value of the repossessed equipment based upon a consideration of prices given in reference books used in the restaurant-equipment trade. A suggested low-selling price and a suggested high-selling price for each of the items was then determined because the Bank was unable to obtain bids for a sale on the property as a whole. Copies of the inventory sheets of the suggested selling prices were then distributed to each of Jet Sales sales persons, who were ordered to go out and push the sales on this equipment. Of the 19 items sold by Jet Sales, ten were sold at prices higher than the suggested high price obtainable, three items were sold at the suggested high price, five items were sold at a price between the suggested prices, and only one of the items was sold for less than the suggested low-selling price. All-American Sub was also given credit for the items that Jet Sales was unable to sell. It is true the assessments and suggested selling prices are subject to attack because they

---

6. The Eighth Circuit Court of Appeals, in applying the U.C.C. as adopted in North Dakota, held the failure of the Government to make a sale in a commercially reasonable manner gave rise to the presumption that the value of the property, if properly sold, would equal the amount of the deficiency. *United States v. Conrad Pub. Co.,* 589 F.2d 949 (8th Cir. 1978).

7. This statute is virtually the same as Section 41 ·09–53, N.D.C.C., which provides, in part:

"1. If it is established that the secured party is not proceeding in accordance with the provisions of this part disposition may be ordered or restrained on appropriate terms and conditions. If the disposition has occurred the debtor or any person entitled to notification or whose security interest has been made known to the secured party prior to the disposition has a right to recover from the secured party any loss caused by a failure to comply with the provisions of this part. . . ."

were determined with the aid of one of the Bank's officers, but we cannot say on this basis alone that the estimates were invalid or that the district court erred in giving weight to them. Nor have Garner and Hardy alleged that they were harmed in any way by the Bank's disposition of the equipment.

The Bank did what was required under the circumstances. It obtained a fair appraisal of the equipment and then made a good-faith effort to have the equipment sold at the best possible price. *Weaver v. O'Meara Motor Co.*, 452 P.2d 87 (Alaska 1969). The district court's finding that the property was either sold or credit was given in a commercially reasonable manner is not clearly erroneous.

We conclude that the Bank has overcome the presumption that arose because of its failure to give notice of intended disposition of the property by proving that the fair market value of the equipment did not exceed the amount received or credit given. Therefore, the Bank is entitled to its deficiency judgment.

The judgment of the district court is affirmed.

ERICKSTAD, C. J., and PEDERSON, SAND and PAULSON, JJ., concur.