602 P.2d 481

Fullmer A. and LaDonna CHAPMAN, husband and wife; Gordon L. and Verdene Chapman, husband and wife; Wayne D. and Betty Martin, husband and wife, Appellants,

v.

Roger FIELD and Lois Field, his wife; and Richard Cantin and Bonnie Cantin, his wife, Appellees.

ANDREW INVESTMENT CORPORATION, an Arizona Corporation, Cross-Appellant,

v.

Fullmer A. and LaDonna CHAPMAN, husband and wife; Gordon L. and Verdene Chapman, husband and wife; Wayne D. and Betty Martin, husband and wife, Cross-Appellees.

No. 14452.

Supreme Court of Arizona, In Banc.

Oct. 23, 1979.

Rehearing Denied Nov. 14, 1979.

Wolfe & Harris, P.A. by Irwin Harris, Phoenix, for appellants and cross-appellees.

John C. Hover, P.C. by John C. Hover, David M. Zeldes, Phoenix, for appellees and cross-appellant.

CAMERON, Chief Justice.

This is a consolidated appeal by parties to a judgment of the trial court which held that the buyers, Richard and Bonnie Cantin, husband and wife, and Roger and Lois Field, husband and wife, were not the alter egos of the Andrew Investment Corporation, and that the sellers, Fullmer and La-Donna Chapman, husband and wife, Gordon and Verdene Chapman, husband and wife, and Wayne and Betty Martin, husband and wife, were entitled to judgment against the Andrew Investment Corporation. We have jurisdiction pursuant to Rule 19(e), Arizona Rules of Civil Appellate Procedure, 17A A.R.S.

We must answer the following questions on appeal:

1. Was Andrew Investment Corporation the alter ego of the Cantins and the Fields?

2.  Are the sellers barred from obtaining a "deficiency judgment" because of their failure to provide a proper notice of disposition of the collateral?

The facts necessary for a determination of this matter on appeal are as follows. In early 1975, the buyers entered into negotiations for the purchase of a car wash located in Phoenix, Arizona, known as "Los Arcos Car Wash." Initially, a newly formed corporation, the Roger Investment Corporation, was to purchase and operate the car wash. Later it was decided that Roger Investment Corporation would not be the buyer, but instead that Andrew Investment Corporation would be the buyer. Andrew Investment Corporation was incorporated 10 February 1975, one day before the close of escrow. When the parties met to sign the documents, it was noted that only two of the documents had been prepared in the name of Andrew Investment Corporation. The rest were in the name of Roger Investment Corporation. Because they were told by the escrow officer that it would take several days longer for all the papers to reflect the name of Andrew Investment Corporation rather than Roger Investment Corporation, it was decided to go ahead and take the business in the name of Roger Investment Corporation. The assignment of the lease, however, was in the name of Andrew Investment Corporation and it was Andrew Investment Corporation which operated the car wash. Eleven months later (in January of 1976), Roger Investment Corporation assigned all of its interest to the Andrew Investment Corporation. Roger Field owned 100% of the stock in Roger Investment Corporation and 50% of the stock of Andrew Investment Corporation. Richard Cantin owned the other half of the Andrew company stock.

In the spring of 1976, some payment checks were returned for insufficient funds and finally payment checks ceased altogether. The keys to the premises were later turned over to the attorney for the sellers and the buyers abandoned the property. The sellers brought suit contending that Roger Investment Corporation and Andrew Investment Corporation were merely the alter egos of the Cantins and the Fields and that the Cantins and the Fields were individually liable. The court disagreed. The buyers contend that the trial court erred in not ruling that the failure of the sellers to follow the Uniform Commercial Code and the agreement as to the notice of sale of collateral should prevent the sellers from obtaining a deficiency judgment. All parties appealed.

## PIERCING THE CORPORATE VEIL

It has been stated that the law regarding the piercing of the corporate veil is "more easily stated than applied." *Dietel v. Day*, 16 Ariz.App. 206, 208, 492 P.2d 455, 457 (1972). It is also the rule that corporate status will not be lightly disregarded:

"* * * it must be noted that a legitimate purpose of incorporation is to avoid personal liability and if the corporate fiction is too easily ignored, * * * then incorporation is discouraged. Stock ownership by a few persons does not mean necessarily that corporation debts should be imposed upon them. If there is no unification of interests and intermingling of funds, so that the corporation loses its separate identity, then the owners should not be personally liable." *Dietel*, supra, 16 Ariz.App. at 208, 492 P.2d at 457.

In deciding whether the trial court was correct in determining that the corporate veil had not been pierced, we must keep in mind that if there is substantial evidence in support of the judgment, it will be affirmed on appeal. *State v. Bearden*, 99 Ariz. 1, 405 P.2d 885 (1965); *City of Phoenix v. Burke*, 9 Ariz.App. 395, 452 P.2d 722 (1969).

Sellers concede that the corporation was set up properly, that the articles of incorporation were properly filed as required, that there was an election made that the corporation would be taxed as a small business or closed corporation by the United States government, that insurance was ordered in the name of the corporation, that a bank account was opened in the corporation's name, and that all other things were done to start up the corporation.

Sellers contend, however, that after being properly incorporated, the corporation became the alter ego of the Cantins and the Fields. Sellers base their contention on three areas of alleged conduct: (1) the clear lack of and disregard for corporate formalities; (2) a constant course of conduct involving the intermingling and commingling of personal and corporate assets and funds during the entire life of the alleged corporation; and (3) confusion among the individual defendants as to which corporation was the owner of the Los Arcos Car Wash.

■ We believe that the sellers have failed to pierce the corporate veil. We agree that the evidence shows that the conduct of the stockholders of the Andrew Investment Corporation was not a model of corporate management. For example, they lent money to the corporation without taking promissory notes, failed to file annual reports with the Arizona Corporation Commission, and failed to keep proper books of account. However, there is no showing of fraud on the part of the buyers, nor is there any indication that the sellers were misled. The evidence is sufficient from which the trial court could find that the Andrew Investment Corporation was a valid corporation and not merely the alter ego of the Cantins and the Fields. The evidence did not compel the trier of fact to find that Andrew Investment Corporation was incorporated or operated as a mere sham or in fraud of the sellers or the public. There was not a sufficient showing that the unity of the interest of the incorporators with the corporation was such that the corporation had lost its separate identity, *Dietel,* supra, or had, in fact, ceased to exist. *Whipple v. Industrial Commission,* 59 Ariz. 1, 121 P.2d 876 (1942); *Home Builders & Suppliers v. Timberman,* 75 Ariz. 337, 256 P.2d 716 (1953).

"There was no substantial evidence of intermingling of corporate and personal assets, affairs or funds, or that the corporate structure was in any way used for other than legitimate corporate purposes. Further, there would have to be a showing that observance of the corporate form would sanction a fraud. [citations omitted] While it is clear that plaintiffs did not receive the benefit of their bargain, that alone does not constitute any evidence of fraudulent conduct and it is not sufficient to justify the disregarding of the corporate entity." *Ferrarell v. Robinson,* 11 Ariz.App. 473, 476, 465 P.2d 610, 613 (1970).

## DEFICIENCY JUDGMENT

The total sales price of the lease, business, and equipment was $175,000 with $25,000 down and a note for $150,000 secured in part by a "chattel security agreement" covering the equipment. After the sellers came into possession of the chattel, they gave notice on Thursday, 7 July 1977, that the chattel might "be sold at private sale any time after 12 July 1977." The notice was received on Friday, 8 July. The collateral was never sold either at private or public sale.

Fullmer Chapman testified as follows:

"Q Now, have you taken possession of any of the items of equipment that were on the original security agreement?

"A Yes.

      *    *    *    *    *    *

"Q And, where are those goods presently stored at this time?

"A At my home.

"Q And have you made any attempts to sell the goods in question?

"A Yes, I contacted Arizona Auctioneers who advertised that they buy shop equipment and that they will move it out or either buy it or take it on consignment. They were not interested.

He says, 'Car wash equipment is practically impossible to move.'

I contacted owners of the Weiss Guys. They were not interested.

I've contacted Bob Ivory (phonetic), an owner of another car wash string. He wasn't interested.

"Q So at the present time you have been unable to find a buyer?

"A Correct."

And Roger Field testified as to the value of the collateral:

"Q BY MR. HARRIS: How about the value of the equipment itself, equipment and inventory?

"A I don't know exactly what the inventory would be, the equipment, I don't think is very much at all.

"Q How much?

"A Ten thousand, I don't know. Five thousand, depends on what you could sell it for really."

The judgment was in the amount of "$138,000 together with taxable costs and reasonable attorney's fees in the sum of $15,000.00." Since the testimony of the escrow officer indicated the balance due under the contract to be $136,981.64, it is apparent that the judgment reflects the prayer in the complaint and that there was no consideration given as to the value of the collateral.

The buyers first contend that because there was no adequate notice, no deficiency judgment is available. They point out that the contract called for 10 days notice of sale.

■ Section C of A.R.S. § 44–3147 allows the parties to a security contract to determine by agreement "the standards by which the fulfillment of [their] rights and duties is to be measured if such standards are not manifestly unreasonable." A 10 day notice under the facts in this case is not unreasonable. By either standard, the 10 day requirement in the contract of sale or the disposition of collateral provision in the Uniform Commercial Code, A.R.S. § 44–3150(C), we believe the notice of sale was inadequate.

" * * * the purpose of notice is to enable the debtor to protect his interest in the property by paying the debt, finding a buyer or being present at the sale to bid on the property or have others do so, to the end that it not be sacrificed by a sale at less than its true value. [citation omitted]." *Franklin State Bank v. Parker*, 136 N.J.Super. 476, 480, 346 A.2d 632, 634–35 (1975).

In a case concerning a 5 day notice over the weekend, the same as here, the Nebraska court stated:

"The mailing of notice on Wednesday of a sale to be held the following Monday would appear to make it difficult, if not impossible, for Rose to arrange financing or take other steps to protect his interest in the collateral, particularly if banks were closed on Saturday." *First Nat. Bank of Bellevue v. Rose*, 197 Neb. 392, 397, 249 N.W.2d 723, 726 (1977).

Even though the secured creditor did not actually sell the property, we believe the same rule should apply. The debtor was entitled to rely on that notice and could assume that the sale would take place. Because of the shortness of time, he could assume that he did not have time to secure the funds to redeem or purchase the chattel. The notice was inadequate.

■ The courts are not in agreement as to whether failure under the Uniform Commercial Code to give adequate notice bars the right to a deficiency judgment. Some courts have held that failure of notice bars a deficiency judgment. *Bank of Gering v. Glover*, 192 Neb. 575, 223 N.W.2d 56 (1974). Some presume that failure of the notice raises a presumption that the collateral was worth the amount of the debt and that the security holder has the burden to show that the amount received at the sale was a reasonable amount. *Barker v. Horn*, 245 Ark. 315, 432 S.W.2d 21 (1968). A third line of cases holds that lack of notice does not bar a deficiency, but that the debtor is entitled to a setoff for any loss which the debtor can show he suffered by lack of notice. *Grant County Tractor Co. v. Nuss*, 6 Wash.App. 866, 496 P.2d 966 (1972). See also Note, 59 A.L.R.3d 401. We agree with the latter holding, *Grant County Tractor Co.*, supra, and believe the same rule should apply where the secured party retains the chattel without sale. While the burden is on the secured creditor to show that the chattel was, in fact, disposed of in a "commercially reasonable" manner, *Vic Hansen & Sons, Inc. v. Crowley*, 57 Wis.2d 106, 203 N.W.2d

728, 59 A.L.R.3d 360 (1973), the Uniform Commercial Code allows the secured party to retain the chattel as long as under the circumstances the retention is "commercially reasonable." A.R.S. § 44–3150(C).

In a case wherein the secured party kept a boat for two years without selling it, the Maryland court held that even though the boat was not disposed of in a "commercially reasonable" manner, the secured party could obtain a deficiency judgment after allowing a setoff for the value of the boat at the time of repossession. However, the Maryland court stated:

> "The uncontroverted evidence seems to support the notion that the boat had a fair market value of $13,900 when he took title and possession. What it was worth at the time of trial we can only guess, since the chancellor made no finding, but it seems safe to assume it was worth a great deal less. The shrinkage in value must be attributed to Bower's conduct which we are persuaded to categorize as not commercially reasonable.

> "We think the chancellor could very well find that the appellant is entitled to a credit of $13,900. We shall remand the case for his further consideration in this regard." *Harris v. Bower*, 266 Md. 579, 591–92, 295 A.2d 870, 876 (1972).

■ In the instant case, the secured parties did not make a commercially reasonable attempt to dispose of the property. Having failed to do so, they are entitled to a deficiency only after a setoff of the damage to the debtor for failure to make a commercially reasonable sale. This could well be the value of the equipment at the time the secured parties came into possession of the chattel. The present judgment does not reflect this amount or any other amount as a setoff against the amount of the judgment.

The matter will have to be returned for the determination of the damage to the debtors by the failure of the sellers to dispose of the chattel in a reasonably commercial manner. Such amount will have to be subtracted from the total judgment.

Reversed and remanded for proceedings consistent with this opinion.

STRUCKMEYER, V. C. J., and HAYS, HOLOHAN and GORDON, JJ., concur.