**Edward H. HOCH and Edward A. Hoch, Appellants,**

v.

**Charles William ELLIS and Evalyn B. Ellis, Appellees.**

No. 4475.

Supreme Court of Alaska.

May 8, 1981.

Peter Walton & Associates, Anchorage, for appellants.

Kenneth R. Lamb, Kenneth R. Lamb & Associates, Anchorage, for appellees.

Before RABINOWITZ, C. J., and CONNOR, BURKE and MATTHEWS, JJ.

## OPINION

RABINOWITZ, Chief Justice.

Charles Ellis and his wife Evalyn, as shareholders in B & E Enterprises, Inc.,

owned the Norge Village Happy Hour Cleaners, a laundromat and dry cleaning operation in Fairbanks. The business operated out of a building owned by Bud Meyeres. In 1967, the business was sold to the 3–H Corporation, an Alaska corporation. 3–H was a family operation with the majority of the stock owned by Edward A. Hoch.[1] The sale of the business was for $154,500. 3–H put up $12,000 as down payment and earnest money. A promissory note for the remaining $142,500 was executed along with a security agreement covering this entire amount. The promissory note was signed both by Edward A. Hoch as president of 3–H Corporation and by each of the three Hochs, individually. The collateral for the security agreement was:

> [a]ll of the cleaning, laundry and related equipment, fixtures and furniture, and any replacements thereof, now owned or hereafter acquired for use in [the laundromat and dry cleaning operation] . . . .

Upon assuming the business, 3–H had initial success in running the laundromat.

In December 1970, 3–H Corporation opened another laundry facility, Suds Laundry and Dry Cleaners, in another section of Fairbanks. Business, however, deteriorated to the extent that 3–H Corporation, in 1971, filed a Chapter XI proceeding in federal court. Edward A. Hoch (henceforth Hoch) testified that it was starting the second laundry operation that drove the 3–H Corporation under financially. For a period of thirteen months, Hoch continued to operate both facilities as a debtor in possession. The business was finally adjudicated bankrupt on October 13, 1972.

During the period of the Chapter XI proceedings, 3–H made only one payment on the promissory note. Appellees instituted suit on August 15, 1972, on the sum still owing on the promissory note, $70,915.86 plus interest.[2] As part of the sale of the business, Ellis had also transferred to 3–H the right to lease the premises of the laundromat at a rental of $1200 per month. Payments on the lease had been kept current through the bankruptcy adjudication proceedings except for the last few monthly payments. After bankruptcy adjudication in October 1972, Ellis was uncertain as to the disposition of the secured property. During the winter of 1972–73, Ellis was living with his family in Phoenix, Arizona, and attempting to clarify the situation by phone. During one of these calls, Ellis offered the landlord of the building, Bud Meyeres, the collateral in part payment of the past due rent. This offer was rejected. Ellis and his wife then came to Fairbanks to try to settle the matter. Ellis never testified as to exactly how long he was in Fairbanks, but it appears to have been, at most, a week or two. They arrived at the end of March. On March 28, Ellis filed an application for reclamation, seeking to reclaim the collateral on the security agreement since it failed to cover the amount secured. Ellis testified that he had not sought reclamation earlier because he had not previously known what to do and had not sublet the building during this period, because he concluded that no one would rent it filled with laundry equipment in a state of disrepair. On April 2, 1973, the trustee in bankruptcy turned the collateral over to Ellis.

At that point, Ellis began making inquiries regarding potential purchasers. Through a series of phone calls, Florian Maldonado was located. Maldonado purchased the equipment for $10,000 cash, and subsequently invested an additional $38,000 in refurbishing the business. Maldonado

---

1. Edward A. Hoch testified that he owned over fifty percent of the stock; his father, Edward H. Hoch, owned ten percent and his uncle, Walter G. Hoch, owned one-third of the stock.

2. The suit was brought by Charles and Evalyn Ellis to whom the promissory note had been assigned by B & E Enterprises in 1969. The complaint stated that the last payment had been made in October 1971 and $70,915.86 was owing, plus interest from October 1971. The suit was originally brought against Edward H. Hoch, Edward A. Hoch, and Walter G. Hoch and not against 3–H Corporation. Walter G. Hoch was dropped from the suit, though, because of a separate action brought against him in California that resulted in a settlement agreement.

also sublet from Ellis the building housing the laundry. However, the lease was for $1500 per month, $300 more than the rate at which 3–H Corporation had leased the building from Ellis ($1200 per month was also the rent in the original lease between Ellis and Meyeres).

Suit proceeded on the original promissory note, and after a non-jury trial the superior court ruled:

> The Ellises are entitled to a judgment against both Defendants, jointly and severally for all amounts unpaid on the Promissory Note, after having been given credit for the amount obtained at the sale and the amount obtained in the companion California litigation, interest thereon as appropriate, costs and attorney's fees.[3]

The paramount issue on this appeal is whether the superior court erred in deducting, from the amount found due from Hoch to Ellis on the promissory note, only $10,000 for the collateral. More specifically, the question is whether there was sufficient evidence advanced by the Ellises to support the superior court's conclusion that the laundry equipment collateral was worth only $10,000, the price for which it was sold, rather than the more than $70,000 remaining to be paid on the promissory note.

We start with the applicable provisions of the U.C.C. Former AS 45.05.788(c) [U.C.C. § 9–504(3)] provided, in relevant part, that "every aspect of the disposition including the method, manner, time, place, and terms must be commercially reasonable," and that (with exceptions not relevant here) "reason-

able notification of the time and place of a public sale or reasonable notification of the time after which a private sale or other intended disposition is to be made shall be sent by the secured party to the debtor."[4]

Appellants argue that the sale was deficient in both these respects, i. e., that notification of the sale was not given to them, and that the manner of the sale was not "commercially reasonable."

If the sale was deficient in either respect, then a burden is placed upon appellees to rebut the presumption that the fair market value of the collateral was at least equal to the amount of the outstanding debt. If they fail to meet this burden, then the presumption leads to the conclusion that the entire debt is discharged:

> The fair and reasonable value of the collateral at the time of repossession should be offset against the balance due on the security agreement. Where the collateral has been sold in a sale that does not comply with the provisions of the UCC, there is a rebuttable presumption that the fair and reasonable value of the collateral is at least equal to the amount of the outstanding debt.

*Kobuk Engineering & Contracting Services, Inc. v. Superior Tank & Construction Co-Alaska, Inc.,* 568 P.2d 1007, 1013 (Alaska 1977). In *Kobuk,* we applied this rule to a sale which did not meet the "commercially reasonable" requirement. In *Weaver v. O'Meara Motor Co.,* 452 P.2d 87 (Alaska 1969), we applied this same rebuttable pre-

---

**3.** For an explanation of the California litigation, see note 2, *supra.*

**4.** Subsection (c) reads:

Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms, but every aspect of the disposition including the method, manner, time, place, and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of a public sale or reasonable notification of the time after which a private sale or intended

disposition is to be made shall be sent by the secured party to the debtor, and, except in the case of consumer goods, to any other person who has a security interest in the collateral and who has duly filed a financing statement indexed in the name of the debtor in the state or who is known by the secured party to have a security interest in the collateral. The secured party may buy at a public sale, and, if the collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations, he may buy at private sale.

This section has been renumbered as AS 45.09.-504(c).

sumption rule to a sale which failed to comply with the notice requirements.

██ Addressing the notice issue first, we note the superior court concluded that the sale violated the notice provision of the statute. This finding was amply supported by the evidence. That being the case, our ruling in *Weaver* controls this matter: "Where noncompliance with the notice of sale provision of AS 45.05.788(c) [currently AS 45.09.504(c)] has been shown, the burden of proving that the market value of the collateral was received at the sale is upon the secured party." *Id.* at 91–92.

Appellants also argue that the sale was not commercially reasonable. We need not address that argument, in light of our agreement with the superior court's conclusion that the notice provisions were violated. Were we to find that the sale was commercially unreasonable, then, under *Kobuk*, a rebuttable presumption would attach that the fair and reasonable value of the collateral was at least equal to the amount of the outstanding debt. This is the practical equivalent to the burden imposed by *Weaver*. If the appellees carry their burden of proof under *Weaver*, they have rebutted any presumption which would attach under *Kobuk* were we to find that the sale was not commercially reasonable.

Thus, it is clear that the issue is whether the appellees met their burden of proving that the market value of the collateral was received, in order to rebut the presumption that the collateral at the time of sale was worth at least the amount of the unpaid

debt. Initially, we must determine what standard of proof must be met. In *Kobuk*, we specifically stated that the burden is on the secured party to prove by "convincing" evidence the value of the collateral. 568 P.2d at 1014. Here the superior court was uncertain as to the appropriate burden of proof,[5] but specifically found the evidence clear and convincing.[6] Given Alaska's position of not totally depriving the secured party of compensation when there is noncompliance with U.C.C. requirements, we think that the more exacting standard of clear and convincing evidence[7] is appropriate.

Having established the standard, we turn to the facts. In *Kobuk*, we noted two ways in which the applicable presumption may be rebutted:

> In order to overcome that presumption, the secured party has the burden of either (1) obtaining a fair and reasonable appraisal at or near the time of repossession, or (2) producing convincing evidence of the value of the collateral. In order to meet the latter burden the secured creditor is required to bring forward proof of the condition of the collateral and the usual price of items of like condition.[8]

568 P.2d at 1013–14.

As to the appraisal leg of this test, the superior court was faced with a variety of appraisals submitted by Hoch in his attempt to persuade the court that the sale was commercially unreasonable. The superior court found these too speculative and unre-

---

5. At trial, there was confusion as to what standard of proof "convincing" was intended to establish. Hoch argued that this court's use of "convincing" created a standard of clear and convincing evidence.

6. The superior court thereafter noted:
 I don't think that's the test. I think that this is a civil case like all other civil cases and the test is by a preponderance of the evidence and clearly that burden has been met.
 Since the superior court found that the higher burden of clear and convincing evidence was met, there is no possibility of error through failure to apply the correct burden of proof.

7. McCormick notes that this standard is applied in "miscellaneous types of claims and defenses, varying from state to state, where

there is thought to be a special danger, or where the court considers that the particular type of claim should be disfavored on policy grounds." C. McCormick, Law of Evidence § 340, at 797–98 (2d ed. 1972). The danger of deception is, we think, well illustrated by the facts in *Kobuk* and in this case; and the policy we are trying to forward is one of compliance with the statutory procedures of the U.C.C.

8. For another discussion of the kinds of evidence that may be used to establish the adequacy or insufficiency of the resale price, see J. White & R. Summers, Uniform Commercial Code § 26–11 at 989–90 (1972).

liable to consider, so we will disregard them.[9]

As to the fair market value of the collateral, the superior court placed considerable weight on the testimony of Maldonado, who purchased the equipment.[10] Maldonado stated that his purchase was a gamble. He stated that he paid $10,000, which he thought was a reasonable price.[11] His testimony as to the cost and effort it took to get the equipment working clearly showed that the equipment was in a poor state of repair.[12] It took $38,000 and an undetermined amount of labor to get the business operational. His testimony, in large part, substantiated a finding that the three estimates proffered by Hoch did not take into account the severe dilapidation of the equipment. While the equipment may have been worth $40,000 or more in good condition or easily repairable condition, its actual state was such that $40,000 may have been unreasonably high. As to the accompanying fixtures, the expense of having to install a new boiler and make the accompanying fixture replacements served to discredit the high values placed on the fixtures by Hoch, Stansberry, and Craft.

 This appears especially accurate at the time and place in question. The local economic market at the time of sale is a recognized factor in determining the value of the collateral.[13] Although neither of the other two Fairbanks laundry operators were informed of the sale, one directly stated he had been in no position to bid on it. During the spring of 1973, Fairbanks was in a severe economic slump prior to the start of the pipeline and buyers were difficult to find. We would conclude that the superior court was correct in its finding that the fair market value of the collateral at the time of

9. *Most of the appraisals were submitted by* Hoch, and they valued the equipment at an amount considerably higher than the amount owed. As such, they avail the Ellises nothing. One contemporaneous assessment by Jim Moran in November 1972 estimated a value of $3,810; the superior court, however, found that this did not "rise to the level of an appraisal."

10. The superior court's finding of fact no. 6 states: "The testimony of FLORIAN MALDONADO is the most credible." The court had clarified at trial that it was not judging credibility as to who was lying or telling the truth but who had the best opportunity to see and report on the equipment.

11. *Maldonado stated he did not think he would* have paid $20,000 for the equipment, and he did not not know if he would have paid $15,-000.

12. Specifically, Maldonado testified as to the following items of equipment:
 a. All 20–20 # washers were operational after repair of '[n]umerous motors, pumps, timers, door switches, glass doors.'
 b. Only three of eight-8 # dry cleaners were repairable.
 c. All 12–50 # dryers were repairable. '[M]ost of the coils in the dryers were frozen and busted.'
 d. The 20/40 # dry cleaner was not repairable after $1,200 of contracted repair work (unpaid) and was abandoned.
 e. The high pressure oil boiler required a McDonald valve (costing approximately $150) to make it operational.
 f. Of four extractors, continued use was made of only one.
 g. The steam press, the ironamatic press and air vacuum unit form finisher were operational.
 h. Only one of two 30 # washers was repairable after replacing bearings, seals, etc.
 i. The electric mangle was junked.
 j. The six Speed Queen washers were replaced.
 k. *The low pressure boiler was replaced.* The old boiler had to be cut and taken out. The new one required a separate boiler room extension and additional steam lines plumbing.
All this took about five or six weeks to get the business operational. During this time, Maldonado worked 16 to 18 hours a day, and his wife, children and friends worked cleaning up the place. A total of $38,000 was spent getting the place operational, which only included a fraction of the labor.

13. *See Hall v. Owen County State Bank*, 370 N.E.2d 918, 929 (Ind.App.1977) ("[E]ven though a low sale price itself is insufficient to overturn a sale, closer scrutiny will generally be given sales in which there is a *substantial* difference between the sale price and the fair value to determine whether there were legitimate causes for the low price such as a depressed or non-existent market, or whether the low price was caused by the secured party's failure to proceed in a commercially reasonable manner"). *See also Commercial Credit Corp. v. Wollgast*, 11 Wash.App. 117, 521 P.2d 1191, 1195 (1974).

sale was the $10,000 the Ellises received, except for one disturbing aspect of the transaction.

█ Hoch further asserts that the increase in the rent pertaining to the sublease of the building resulted in a "secret profit" obtained by the Ellises in their sale to Maldonado, which should have been reflected in the deficiency judgment. This court dealt with an analogous problem in *Kobuk*, in which we found potential self-dealing when the secured creditor purchased the collateral for a fraction of the secured debt and resold it for two and one-half times that amount six weeks later.[14] We noted:

> Where by failing to give such notice as would guarantee competitive bidding the secured party insures an opportunity for self-dealing, we will scrutinize the sale closely.[15]

The problem was that the secured debtor could thus obtain a double recovery—once from the second sale of the collateral to the third party, and once from the deficiency judgment, which would be reduced only by the artificially deflated amount realized from the original sale.

In this case, although the sale of the collateral was to an independent third party, we are again faced with a situation in which the secured creditor could have artificially deflated the formal sale price for the collateral by offering it as part of a package deal, along with an inflated price for the leasehold. Concomitant with the sale was a sublease to Maldonado at a rental that was $300 per month more than had previously been paid by the Hochs.

As in *Kobuk*, the Ellises could in effect recover twice for some portion of their debt: once from the increase in rent obtained from Maldonado in return for the artificially deflated price of the collateral, and again from the deficiency judgment against the Hochs, which would only be offset by that artificially deflated price. As Hoch noted, "[s]ince the sublease had a remaining term of 13 years 8 months, the Ellis[es]

stood to gain a total profit of $49,200 ($300 × 164 months)."

Ellis, in response, argues that the leasehold was not part of the security interest arrangements, and notes that former AS 45.05.696(10) [currently AS 45.09.104(10)] excludes leaseholds from the application of U.C.C. security provisions. However, we think Hoch is correct in arguing that this is irrelevant to a determination of whether the arrangement manages by an adjustment of the two amounts to provide for a hidden profit not properly reflected in the deficiency judgment.

The original lease from Meyeres to Ellis was executed in 1966 for $1,200 per month, and the sublease between Ellis and Maldonado, in 1973, for $300 more per month, may not have been unreasonable, given continually rising property values. However, if there was such a poor business climate that it affected the sale of laundry equipment and furnishings, as Ellis argues, it would most likely have also affected the value of a lease of premises designed for use as a laundry.

Regrettably, the court made no specific findings on this issue. No evidence was advanced at trial by either party to suggest what the reasonable rental value of this building was in 1973. Nevertheless, we think that this factual situation presents a strong likelihood that such manipulation occurred. Given that the Ellises had the burden of overcoming, by clear and convincing evidence, the presumption that the value of the repossessed collateral was equal to the debt it secured, and given that situations, such as this one, which present opportunities for "double recovery" must be closely scrutinized, we think that a substantial profit received from such apparent manipulation of the terms of the sale must be, under the circumstances presented here, offset against any deficiency judgment obtained. Since no notice was given to the debtor, and since no evidence was presented

---

14. *Kobuk Eng'r & Contracting Serv., Inc. v. Superior Tank & Constr. Co-Alaska, Inc.*, 568 P.2d 1007, 1009–10 (Alaska 1978).

15. *Id.* at 1011.

by the secured creditor explaining the increased rental on valid grounds, the increased rentals obtained will be offset against the deficiency resulting from the sale. Thus, in the case at bar, the deficiency judgment must be reduced by the present value of the $49,200 that is receivable by the Ellises over the remaining term of the lease.

REVERSED and REMANDED.

BURKE, J., dissents.

BURKE, Justice, dissenting.

I respectfully disagree with the majority opinion. First, I believe that only a simple preponderance of the evidence, rather than "clear and convincing" evidence, should be required to rebut the presumption that the value of the collateral equals the amount of the outstanding debt, which arises when the creditor has failed either to give the notice or proceed with the sale in the commercially reasonable manner required by section AS 45.09.504(c) (U.C.C. § 9–504(3)). *See Kobuk Eng'r & Contracting Serv. v. Superior Tank & Constr. Co-Alaska*, 568 P.2d 1007, 1013–14 (Alaska 1977); *Weaver v. O'Meara Motor Co.*, 452 P.2d 87, 91–92 (Alaska 1969). Second, I disagree with the conclusion of the majority that the evidence shows that Ellis "covertly" received part of the pay-

ment for the collateral from Maldonado through an increased monthly rental on the new sublease of the premises.

I

In first addressing the issue of the standard of proof which should be required in rebutting the *Kobuk-Weaver* presumption, it is valuable to survey the way other courts have decided the issue. No less than forty-seven jurisdictions have been faced with the issue of what effect a creditor's failure to comply with section 9–504(3) should have on his right to obtain a deficiency judgment. The decisions of these courts fall into three groups.[1] The first group consists of courts holding that compliance with section 9–504(3) is a condition precedent to recovery of a deficiency and that a creditor's failure to comply results in an automatic forfeiture of any right to a deficiency judgment.[2]

The second group contains courts that have not been so harsh on creditors. These courts have allowed a misbehaving creditor to collect his deficiency judgment if he can prove that the collateral was sold for at least market value, thereby showing that the debtor has not been harmed. These courts (including Alaska) phrase this test as a rebuttable presumption that the value of the collateral equals the amount of the out-

---

1. J. White & R. Summers, The Law Under the Uniform Commercial Code § 26–15 (2d ed. 1980); Annot., 59 A.L.R.3d 401 (1974 & Supp. 1980); Annot., 30 A.L.R.3d 9, §§ 25.3, 26[d], 27 (1970 & Supp.1980). *See also* R. Anderson, Uniform Commercial Code §§ 9–504:28, :30 (2d ed. 1971 & Supp.1980).

2. *Atlas Thrift Co. v. Horan*, 27 Cal.App.3d 999, 104 Cal.Rptr. 315, 318–21 (1972); *Wilmington Trust Co. v. Conner*, 415 A.2d 773, 779–81 (Del.1980); *Randolph v. Franklin Inv. Co.*, 398 A.2d 340, 347–48 (D.C.1979); *Turk v. St. Petersburg Bank and Trust Co.*, 281 So.2d 534, 536 (Fla.App.1973); *Braswell v. American Nat'l Bank*, 117 Ga.App. 699, 161 S.E.2d 420, 422 (1968); *Stensel v. Stensel*, 63 Ill.App.3d 639, 20 Ill.Dec. 548, 551, 380 N.E.2d 526, 529 (1978); *Herman Ford-Mercury, Inc. v. Betts*, 251 N.W.2d 492, 496 (Iowa 1977); *Bank Josephine v. Conn*, 599 S.W.2d 773, 775 (Ky.App.1980); *Camden Nat'l Bank v. St. Clair*, 309 A.2d 329, 332–33 (Me.1973); *Maryland Nat'l Bank v. Wathen*, 288 Md. 119, 414 A.2d 1261, 1265 (Md.1980); *One Twenty Credit Union v. Darcy*,

5 U.C.C. Rep.Serv. 792, 793 (Mass.Dist.1968); *Gateway Aviation, Inc. v. Cessna Aircraft*, 577 S.W.2d 860, 863 (Mo.App.1978); *Farmers State Bank v. Mobile Homes Unlimited*, 593 P.2d 734, 737 (Mont.1979) (not clear, but appears to hold for forfeiture); *Bank of Gering v. Glover*, 192 Neb. 575, 223 N.W.2d 56, 58–59 (1974) (however the Nebraska Supreme Court held for a rebuttable presumption one year earlier in *Cornett v. White Motor Corp.*, 190 Neb. 406, 209 N.W.2d 341, 344 (1973), and has never overruled the case); *Central Budget Corp. v. Garrett*, 48 A.D.2d 825, 368 N.Y.S.2d 268, 270 (1975); *Liberty Nat'l Bank v. Greiner*, 62 Ohio App.2d 125, 405 N.E.2d 317, 322–23 (1978); *FMA Fin. Corp. v. Pro-Printers*, 590 P.2d 803, 807–08 (Utah 1979); *Chittenden Trust Co. v. Maryanski*, 415 A.2d 206, 210 (Vt.1980); *Aimonetto v. Keepes*, 501 P.2d 1017, 1019 (Wyo. 1972). *See also Murdock Acceptance Corp. v. S & H Distrib. Co.*, 331 So.2d 870, 871–72 (La.App.1976), *cert. denied*, 334 So.2d 435 (La. 1977) (applying non-code law).

standing debt where the creditor has failed to comply with the notice or commercially reasonable disposition requirements of section 9–504(3). These courts hold that the presumption is rebutted by proving the actual or market value of the collateral.[3]

Finally, the third group of courts hold that the debtor has an adequate remedy in the damages provided in section 9–507(1) and require the debtor to bear the burden of proving his damages resulting from the creditor's misbehavior. These courts then simply allow the debtor to setoff his proven

damages against the creditor's recovery of a deficiency judgment.[4]

As can be seen from these cases, the majority of jurisdictions have chosen not to penalize creditors with automatic forfeitures of deficiency judgments. However, it is clear that there is a sharp and confusing split of authority on the issue. An excellent example of this frustrating split is presented by the New York courts where intermediate appellate courts have adopted all three positions on the issue.[5]

---

**3.** Kobuk Eng'r & Contracting Servs. v. Superior Tank & Constr. Co-Alaska, 568 P.2d 1007, 1013–14 (Alaska 1977); Universal C. I. T. Credit Corp. v. Rone, 248 Ark. 665, 453 S.W.2d 37, 39–40 (1970); Community Management Ass'n v. Tousley, 32 Colo.App. 33, 505 P.2d 1314, 1316–17 (1973); Savings Bank of New Britain v. Booze, 34 Conn.Sup. 632, 382 A.2d 226, 228–29 (1977); Bank of Oklahoma v. Little Judy Inds., 387 So.2d 1002, 29 U.C.C.Rep.Serv. 1454, 1457 (Fla.App.1980); Mack Fin. Corp. v. Scott, 100 Idaho 889, 606 P.2d 993, 995–96 (Idaho 1980); Lake Shore Nat'l Bank v. McCann, 78 Ill.App.3d 580, 33 Ill.Dec. 577, 580–581, 396 N.E.2d 1301, 1304–05 (Ill.App.1979); Hall v. Owen County State Bank, 370 N.E.2d 918, 928 (Ind.App.1978); Fedders Corp. v. Taylor, 473 F.Supp. 961, 977–78 (D.Minn.1979) (applying Minnesota law); Walker v. V. M. Box Motor Co., 325 So.2d 905, 906 (Miss.1976); Wirth v. Heavey, 508 S.W.2d 263, 268–69 (Mo.App. 1974); U. C. Leasing, Inc. v. Laughlin, 606 P.2d 167, 171 (Nev.1980); Conti Causeway Ford v. Jarossy, 114 N.J.Super. 382, 276 A.2d 402, 404–05 (Dist.Ct.1971), aff'd, 118 N.J.Super. 521, 288 A.2d 872 (App.Div.1972); Clark Leasing Corp. v. White Sands Forest Products, Inc., 87 N.M. 451, 535 P.2d 1077, 1081–82 (1975); Security Trust Co. v. Thomas, 59 A.D.2d 242, 399 N.Y. S.2d 511, 514 (1977); Hodges v. Norton, 29 N.C.App. 193, 223 S.E.2d 848, 851–52 (1976); State Bank of Burleigh County v. All-American Sub., Inc., 289 N.W.2d 772, 780 (N.D.1980); All-States Leasing Co. v. Ochs, 42 Or.App. 319, 600 P.2d 899, 906–07 (1979); Alliance Discount Corp. v. Shaw, 195 Pa.Super. 601, 171 A.2d 548, 550 (1961) (not clear, but appears to hold for presumption); Associates Capital Serv. Corp. v. Riccardi, 408 A.2d 930, 933–34 (R.I. 1979); Investors Acceptance Co. v. James Talcott, Inc., 61 Tenn.App. 307, 454 S.W.2d 130, 140–41 (1969); Ward v. First State Bank, 605 S.W.2d 404, 406 (Tex.Civ.App.1980); Vic Hansen & Sons v. Crowley, 57 Wis.2d 106, 203 N.W.2d 728, 734–35 (Wis.1973) (not clear, but appears to hold for presumption).

**4.** Valley Mining Corp. v. Metro Bank, 383 So.2d 158, 163–65 (Ala.1980); Chapman v. Field, 124

Ariz. 100, 602 P.2d 481, 485–86 (1979); Barbour v. United States, 562 F.2d 19, 21–22 (10th Cir. 1977) (applying Kansas law); Abbott Motors, Inc. v. Ralston, 5 U.C.C.Rep.Serv. 788, 791 (Mass.Dist.1964); Wilson Leasing Co. v. Seaway Pharmacal Corp., 53 Mich.App. 359, 220 N.W.2d 83, 89 (1974); Stanchi v. Kemp, 48 A.D.2d 973, 370 N.Y.S.2d 26, 28 (1975); Beneficial Finance Co. v. Young, 612 P.2d 1357, 1359–62 (Okl.1980); Farmers State Bank v. Otten, 87 S.D. 161, 204 N.W.2d 178, 182 (1973); Grant County Tractor Co. v. Nuss, 6 Wash.App. 866, 496 P.2d 966, 969 (1972).

**5.** Security Trust Co. v. Thomas, 59 A.D.2d 242, 399 N.Y.S.2d 511, 514 (1977) (presumption); Stanchi v. Kemp, 48 A.D.2d 973, 370 N.Y.S.2d 26, 28 (1975) (setoff); Central Budget Corp. v. Garrett, 48 A.D.2d 825, 368 N.Y.S.2d 268, 270 (1975) (forfeiture).

Other jurisdictions also have internal conflicts of decisions: Bank of Oklahoma v. Little Judy Inds., 387 So.2d 1002, 29 U.C.C.Rep.Serv. 1454, 1457 (Fla.App.1980) (presumption); Turk v. St. Petersburg Bank and Trust Co., 281 So.2d 534, 536 (Fla.App.1973) (forfeiture). Chicago City Bank & Trust Co. v. Wilson, 86 Ill.App.3d 452, 41 Ill.Dec. 466, 469, 407 N.E.2d 964, 967 (1980) (presumption); Stensel v. Stensel, 63 Ill.App.3d 639, 20 Ill.Dec. 548, 551, 380 N.E.2d 526, 529 (1978) (forfeiture). One Twenty Credit Union v. Darcy, 5 U.C.C.Rep.Serv. 792, 793 (Mass.Dist.1968) (forfeiture); Abbott Motors, Inc. v. Ralston, 5 U.C.C.Rep.Serv. 788, 791 (Mass.Dist.1964) (setoff). Gateway Aviation, Inc. v. Cessna Aircraft, 577 S.W.2d 860, 863 (Mo.App.1978) (forfeiture); Wirth v. Heavey, 508 S.W.2d 263, 268–69 (Mo.App.1974) (presumption).

In addition, some federal courts have felt so strongly on the issue that they have expressly refused to apply controlling decisions under state law. E. g., United States v. Willis, 593 F.2d 247, 260 (6th Cir. 1979) (applying Ohio law and holding for presumption despite recognition of an Ohio appellate court opinion clearly holding for forfeiture in Liberty National Bank v. Greiner, 62 Ohio App.2d 125, 405 N.E.2d 317, 322–23 (1978)).

The reasoning used by these courts to support their choice of when to allow a deficiency judgment is enlightening. The first group of courts above, which have adopted the forfeiture rule absolutely barring deficiency judgments, have put forth several reasons to rationalize that harsh result. Several of these opinions start off with the mistaken statement that the majority rule is for forfeiture. *E. g., Chittenden Trust Co. v. Maryanski*, 415 A.2d 206, 210 (Vt.1980). From there they usually proceed to reliance on pre-U.C.C. law allowing forfeitures of deficiency judgments under the old Uniform Conditional Sales Act, basing such a decision on the claim that U.C.C. section 1–103 continued such law in effect.[6] *E. g., Atlas Thrift Co. v. Horan*, 27 Cal.App.3d 999, 104 Cal.Rptr. 315, 320–21 (1972); *Wilmington Trust Co. v. Conner*, 415 A.2d 773, 779 (Del.1980); *Maryland Nat'l Bank v. Wathen*, 288 Md. 119, 414 A.2d 1261, 1265 (1980); *Chittenden*, 415 A.2d at 210. The argument then continues that the drafters of the U.C.C. must have been aware of the trend of denying deficiency judgments under the old law, and therefore, since the U.C.C. contains no ex-

press abrogation of the rule, the drafters must have intended for the forfeiture rule to continue under the U.C.C. *E. g., Chittenden*, 415 A.2d at 210; *Maryland Nat'l*, 414 A.2d at 1265.

Next, these opinions generally emphasize the ease of creditor compliance with the requirements of section 9–504(3) as compared with the harm to the debtor in not having notice in that the debtor cannot exercise his right to redeem nor attend any sale to drive up the price of the collateral. *E. g., Wilmington*, 415 A.2d at 780–81; *Maryland Nat'l*, 414 A.2d at 1265. Then these courts place reliance on the language of section 504(3) which they claim sets out the notice and commercially reasonable sale requirements as conditions precedent to the recovery of a deficiency.[7] *E. g., Wilmington*, 415 A.2d at 780–81; *Maryland Nat'l*, 414 A.2d at 1265; *Chittenden*, 415 A.2d at 210. Finally, these decisions find that the remedy provided the debtor by section 9–507(1), which gives the debtor a cause of action for damages, is inadequate and not exclusive.[8] *Id.*

6. Section 1–103 (AS 45.01.103) provides in relevant part:

Unless displaced by the particular provisions of this Act, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions.

For examples of pre-U.C.C. decisions holding for the forfeiture rule see *United Sec. Corp. v. Tomlin*, 198 A.2d 179, 181 (Del.Super.1964); *Commercial Credit Corp. v. Swiderski*, 195 A.2d 546, 548 (Del.Super.1963).

7. However, this contention has little basis in the actual wording of section 9–504(3). The wording itself does not necessarily indicate that notice and commercial reasonableness of the sale are conditions precedent. Section 9–504(3) provides in relevant part:

Sale or other disposition may be . . . on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. . . . [R]easonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor
. . . .

In other places in the U.C.C. the drafters had little difficulty in clearly expressing conditions precedent. See for example section 2–607(3)(a) which provides: "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or *be barred from any remedy.*" (Emphasis added.)

There seems to be no reason why the drafters would not have used clear language to indicate *the forfeiture of the remedy of a deficiency* judgment for failure to comply with section 9–504(3) when they clearly and effectively used such language elsewhere in the code.

8. Many recent commentators have been highly critical of the forfeiture effect of making compliance with section 9–504(3) a condition precedent to the right to a deficiency judgment. One leading authority notes that section 9–507(1) and the code's spirit of commercial reasonableness require *adjustment* of the creditor's remedy, *not forfeiture.* There is "no statutory warrant for the judicial disregard of the Code's provisions." R. Henson, Secured Transactions § 10–6, at 359–60 (2d ed. 1979). Henson maintains that the earlier forfeiture cases resulted from a misunderstanding of the code's inner workings and that later cases have perpetuated the mistake through stare decisis. *Id. Accord,*

On the other hand, the majority of courts which oppose the automatic forfeiture of a deficiency judgment (the second and third groups above which allow either a presumption or a setoff in favor of the debtor) ground their decisions on twin pillars of the U.C.C.: commercial reasonableness and an abhorrence of penal forfeitures. The courts which have opposed the absolute bar on deficiency judgments have often used strong language to attack decisions of courts upholding forfeitures. In *Clark Leasing Corp. v. White Sands Forest Products, Inc.*, 87 N.M. 451, 535 P.2d 1077 (1975), the court stated, "We consider this rule [allowing forfeitures] repugnant to the spirit of the U.C.C. The complete denial of a deficiency smacks of the punitive and is directly contrary to Article Nine's underlying theme of commercial reasonableness." *Id.* 535 P.2d at 1081. *Accord, e. g., Mack Fin. Corp. v. Scott*, 100 Idaho 889, 606 P.2d 993, 995–96 (1980); *Hall v. Owen County State Bank*, 370 N.E.2d 918, 927 (Ind.App.

1977); *Fedders Corp. v. Taylor*, 473 F.Supp. 961, 978 (D.Minn.1979) (applying Minnesota law); *Hodges v. Norton*, 29 N.C.App. 193, 223 S.E.2d 848, 851–52 (1976); *State Bank of Burleigh County v. All-American Sub, Inc.*, 289 N.W.2d 772, 780 (N.D.1980); *Beneficial Fin. Co. v. Young*, 612 P.2d 1357, 1360 (Okl.1980). These cases emphasize the Code's general ban on punitive damages as codified in section 1–106.[9] *E. g., Mack*, 606 P.2d at 996; *Hall*, 370 N.E.2d at 927; *Barbour v. United States*, 562 F.2d 19, 21 (10th Cir. 1977) (applying Kansas law); *Beneficial*, 612 P.2d at 1360; *Associates Capital Serv. Corp. v. Riccardi*, 408 A.2d 930, 933 (R.I.1979). Most of the opinions then go on to note that sections 9–502(2) and 9–504(2) expressly grant the creditor the right to a deficiency judgment.[10] Such a right is then found consistent with the language of section 9–507(1) which provides the debtor with a remedy by which he may be made whole without penalizing the creditor.[11] *E.*

---

e. g., Minetz, *May a "Wrongoer" Recover a Deficiency Judgment or is Section 9–507(1) a Debtor's Exclusive Remedy?*, 6 U.C.C.L.J. 344, 361–63 (1974); Note, *A Creditor's Right to a Deficiency Judgment under Article 9 of the Uniform Commercial Code: Effect of Lack of Notice*, 42 Brooklyn L.Rev. 56, 77–79 (1975); Note, *Randolph v. Franklin Investment Co.: Forfeiture of Deficiency Judgment for Failure to Give Reasonable Notice of Resale Under the Default Provisions of the U. C. C.*, 29 Catholic U.L.Rev. 1013, 1023–31 (1980); Comment, *Reevaluating Section 9–504(2) of the Uniform Commercial Code: Deficiency Actions After Commercially Unreasonable Collateral Sales*, 2 W.New Eng.L.Rev. 493, 520–22 (1980).

However, other commentators have supported the forfeiture rule. *E. g.*, 2 G. Gilmore, Security Interests in Personal Property § 44.9.4, at 1263–64 (1965) (Contains shallow analysis relying on former law under the Uniform Conditional Sales Act and stating, "that a proper resale was a condition precedent to the recovery of a deficiency seemed too obvious to require either a reasoned analysis or the citation of precedent."); Note, *Denial of Deficiency: A Problem of Reasonable Notice Under U.C.C. § 9–504(3)*, 34 Ohio St.L.J. 657, 668–69 (1973) (Unashamedly advocates use of forfeiture, "Because it is a punitive measure [which] has a deterrent effect upon secured parties." Of course, even the strongest cases supporting forfeiture shun such a blatantly non-U.C.C. analysis.)

9. Section 1–106(1) (AS 45.01.106(a)) provides:

The remedies provided by this Act shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed but neither consequential or special nor penal damages may be had except as specifically provided in this Act or by other rule of law.

10. Section 9–502(2) (AS 45.09.502(b)) provides in relevant part:

If the security agreement secures an indebtedness, the secured party must account to the debtor for any surplus, and unless otherwise agreed, the debtor is liable for any deficiency.

Section 9–504(2) (AS 45.09.504(b)) provides in relevant part:

If the security interest secures an indebtedness, the secured party must account to the debtor for any surplus, and, unless otherwise agreed, the debtor is liable for any deficiency.

11. Section 9–507(1) (AS 45.09.507(a)) provides in relevant part:

*Secured Party's Liability for Failure to Comply with this Part*

(1) If it is established that the secured party is not proceeding in accordance with the provisions of this Part disposition may be ordered or restrained on appropriate terms and conditions. If the disposition has occurred the debtor or any person entitled to notification or whose security interest has been made known to the secured party prior

*g., Hall,* 370 N.E.2d at 926–27; *Hodges,* 223 S.E.2d at 851–52; *Associates,* 408 A.2d at 933; *United States v. Whitehouse Plastics,* 501 F.2d 692, 695 (5th Cir. 1974), *cert. denied,* 421 U.S. 912, 95 S.Ct. 1566, 43 L.Ed.2d 777 (1975) (applying Texas law); *Grant County Tractor Co. v. Nuss,* 6 Wash.App. 866, 496 P.2d 966, 969 (1972).

Of the majority of jurisdictions which refuse to impose on the erring creditor the penal forfeiture of an automatic bar against a deficiency judgment, most indulge in a presumption to help protect the creditor. *See* note 2 *supra.* In Alaska, this is the *Kobuk-Weaver* presumption which provides that when a creditor fails to comply with section 9–504(3), the value of the collateral is presumed to be equal to the outstanding debt. The creditor may then rebut this presumption by proving the market value of the collateral. *Kobuk,* 568 P.2d at 1013–14. The courts have set out two basic reasons for indulging in this presumption which places the burden of proof on the creditor to prove the value of the collateral. First, the creditor is the guilty party who has violated the requirements of section 504(3) and should therefore justly bear the burden of proving the value of the collateral and his resulting right to a deficiency judgment. Second, the creditor as the possessor and seller of the collateral, has the better access to the evidence of the true value of the collateral. *E. g., Norton v. Nat'l Bank of Commerce,* 240 Ark. 143, 398 S.W.2d 538, 542 (1966); *Mack,* 606 P.2d at 996; *All-States Leasing Co. v. Ochs,* 42 Or. App. 319, 600 P.2d 899, 907 (1979); *Associates,* 408 A.2d at 933.

Of the twenty-three states which currently have cases holding for the rebuttable presumption, none require "clear and convincing" evidence to rebut it. On the contrary, "The secured party can still recover a deficiency if he can prove by a *fair preponderance* of the evidence that the reasonable value of the collateral was less than the outstanding debt." *Savings Bank of New*

*Britain v. Booze,* 34 Conn.Sup. 632, 382 A.2d 226, 229 (Conn.Super.1977) (emphasis added). *Accord, Fedders Corp. v. Taylor,* 473 F.Supp. 961, 978 (D.Minn.1979).

The only possible policy that the majority's ruling requiring a "clear and convincing" evidence standard could serve is to protect the debtor from the creditor, at an unfair expense to the creditor. Such a holding is a backward step away from the commercial reasonableness of the rebuttable presumption and a step towards the penal forfeiture of the automatic and absolute bar of a deficiency judgment. In making the sale the creditor has two options, either follow the procedures in section 9–504 or, in the alternative, prove the market value. If the creditor proves by a preponderance of the evidence that the collateral was sold for its true value, the debtor has suffered no harm, and the creditor should be entitled to the deficiency. The U.C.C. is *not a consumer protection statute.* It is of general application to all commercial transactions, including those with giant corporations as debtors, as well as those with individual consumers as debtors. The rights of debtors and creditors should be kept carefully in balance in any interpretation of article 9. If particular situations are felt to be fraught with the potential for abuse, they should be corrected with other legislation of particular applicability, such as consumer protection statutes. *See, e. g.,* Uniform Consumer Credit Code § 5–103; Cal. Civ.Code § 1812.5; Ill.Ann.Stat. ch. 121½, §§ 526, 580; N.M.Stat.Ann. § 50A–9–504(2); Wash.Rev.Code Ann. § 62A.9–501(1).

It should also be noted that the U.C.C. as enacted by Alaska's legislature contains an express declaration that the code is to be interpreted "to make uniform the law among the various jurisdictions." AS 45.01.102(b)(3). This goal of uniformity in commercial law was one of the guiding foundations on which the code was drafted. *See, e. g.,* J. White & R. Summers, The Law

to the disposition has a right to recover from the secured party any loss caused by a failure

to comply with the provisions of this Part.

Under the Uniform Commercial Code § 6, at 20–21 (2d ed. 1980). While there is a difference of opinion among the commentators on the success of this search for uniformity, *id.* §§ 6–7, and a decision from another jurisdiction which is clearly wrong should, of course, not be followed, *id.* § 4, at 10; R. Henson, Secured Transactions § 2–2, at 11–12 (2d ed. 1979), uniformity is still a viable and worthwhile goal. Therefore, stare decisis should play a particularly strong role in applying persuasive U.C.C. cases from other jurisdictions. *E. g., Commonwealth v. Nat'l Bank & Trust Co.*, 469 Pa. 187, 364 A.2d 1331, 1335 (1976); *Needle v. Lasco Inds.*, 10 Cal.App.3d 1105, 89 Cal. Rptr. 593, 595 (1970). *See also Pittsburgh-Des Moines Steel Co. v. Brookhaven Manor Water Co.*, 532 F.2d 572, 580 (7th Cir. 1976) (applying Illinois law); *Helvey v. Wabash County REMC*, 278 N.E.2d 608, 610 (Ind. App.1972); *House of Stainless, Inc. v. Marshall & Ilsley Bank*, 75 Wis.2d 264, 249 N.W.2d 561, 567 (1977).

In the present case virtually every jurisdiction has passed on the issue of what effect a secured creditor's failure to comply with section 9–504 should have on his right to a deficiency judgment. To date these cases have fallen into the three categories outlined above. With its opinion, the majority today creates yet a fourth category, further defeating the goal of uniformity under the U.C.C. The issue of what standard of proof should be required to rebut the presumption has been resolved by other jurisdictions to be by a preponderance of the evidence. This persuasive precedent should carry great weight in keeping this court from creating yet another unnecessary and non-uniform wrinkle of complexity to the U.C.C.

Finally, the proliferation of varying standards of proof in civil cases is a generally undesirable concept resulting in increased complication with little, if any, real benefit.

In the present case, in reviewing the findings of the trial judge regarding the value of the collateral, I cannot say with a definite and firm conviction in light of the entire record that he was clearly mistaken [12] in finding that Ellis carried his burden of proof in establishing by a preponderance of the evidence that the market value of the collateral was $10,000.

## II

The analysis in the second part of the majority opinion in support of the "covert profit" theory is incorrect. The analogy to *Kobuk* is inapposite.

There is no self-dealing in this case. Hoch sold both the collateral and the sublease to an independent and willing third-party buyer. There simply is no self-dealing here by definition. In the absence of any evidence so indicating, there is no reason to believe that the third-party buyer would have had any motive to allow the purchase price of the sublease to be inflated and the price of the collateral deflated. The independent buyer would instead have every reason to value each item of his purchase at what he felt to be a fair price.

The contention that there was some kind of under the table deal between Ellis and Maldonado whereby there was a "covert profit" on the sale of the collateral, which was switched over to a profit on the sublease, is not supported by any evidence in the record. It is pure conjecture. On the other hand, as noted by the majority, Maldonado testified that he had paid $10,000 for the collateral, which he considered to be a reasonable price. In weighing this testimony, the trial court expressly found that Maldonado was the most credible witness. See majority op., notes 11–12 & accompanying text. Therefore, the trial court cannot be said to be clearly erroneous [13] in finding that there was no "covert profit" or, in other words, that the $10,000 represented the actual amount paid by Maldonado to Ellis for the collateral.

---

**12.** *Alaska Foods, Inc. v. American Mfrs. Mut. Ins. Co.*, 482 P.2d 842, 847–48 (Alaska 1971); Alaska R.Civ.P. 52(a).

**13.** See note 12 *supra.*

The majority's conclusion that the $300 increase on the sublease was a concealed portion of the price of the collateral also flies in the face of the preceding pages of factual analysis whereby the court concludes, in effect, that the fair value of the collateral was only $10,000 (by "clear and convincing" evidence). The court then turns around and says that the collateral was actually sold for another $50,000, a grand total of $60,000. This would be six times what the court just found by "clear and convincing" evidence to be the fair value of the collateral.

In the present case, Ellis presented evidence showing his and Maldonado's allocation of the purchase price. Hoch presented no evidence at all which showed that this allocation did not represent the parties good faith allocation according to the respective value of the lease and the collateral. It is simply impossible to say with a definite and firm conviction that the trial court was clearly mistaken in finding that Maldonado paid only $10,000 for the collateral.

A reference to a recent California case in which the profit on a real property sublease was properly setoff against the creditor's deficiency judgment serves to illustrate the fallacy of the majority in the present case.

In *Grossman v. Lippson*, 81 Cal.App.3d 554, 146 Cal.Rptr. 741 (1978), the debtor had purchased a car wash as a "package deal" which included (1) the selling of the business goodwill, (2) a lease-purchase agreement on the building and car wash equipment (a sale with a security interest under U.C.C.), and (3) a real property sublease on the premises. *Id.*, 146 Cal.Rptr. at 743. The sublease and the lease-purchase agreement were interconnected with cross-default provisions. The sublease itself specified that a default in either the premises sublease or the equipment lease-purchase could be considered a default under both instruments. *Id.* at 747. The court then went on to correctly conclude, "Accordingly, when the creditor repossessed all three components of the enterprise (premises, equipment, and ongoing business) the debtor became entitled to receive credit against the

unpaid balance of the promissory note for the value of each of the three components repossessed, which together constituted the security for the debt." *Id.*

The present case bears no resemblance to *Grossman*. In the present case, the sublease of the premises is completely unrelated to the security agreement on the laundry equipment which secures the promissory note. There are no cross-default provisions in the security agreement and the real property sublease. If the debtor were to default on only the sublease, the creditor would have no remedy against the collateral. On the other hand, if the debtor were to default only on the note, the creditor would not have the remedy of terminating the sublease and repossessing the real property. The two instruments are separate and independent. For a default on the note, the creditor has the remedies of article 9 on secured transactions. U.C.C. §§ 9-501 to 9-507. For a default on the lease, the creditor has the remedies available at common law to a landlord with a defaulting tenant. Namely, he may decline the surrender of the lease and hold the tenant liable for the rent and may relet for the tenant's benefit (and account to the tenant for any surplus rent). On the other hand, the landlord may terminate the lease, thereby releasing the tenant from future rent obligations, but also ending any duty to account to the tenant for surplus rent. Restatement (Second) of Property § 12.1, comment i (1977).

The majority opinion is also incorrect in analyzing the "covert profit" as providing evidence of fair market value under the rebuttable presumption of *Kobuk*. The issue presented by this so-called "covert profit" theory initially has nothing to do with the proof of the market value of the collateral which is required to rebut the presumption. Rather, this issue concerns whether Ellis accounted to Hoch for the full amount for which the collateral was actually sold. This is a factual issue which, as stated above, would simply turn on the objective manifestations of intent of Ellis and Maldonado. On this issue, I again cannot say that

the trial judge was clearly erroneous in finding that the $300 increase on the monthly rent was just that, rent. Once this finding is upheld, the amount of the lease becomes irrelevant in establishing the market value of the collateral.

It should also be noted that if indeed Maldonado was paying in excess of $60,000 for the collateral, Ellis chose a very poor way of getting his money in "hiding" the "covert profit" in the lease payments. There is no guarantee that he will ever get his money if Maldonado defaults on the lease. If the lease is terminated for nonpayment of rent, Ellis loses his "covert profit."

In conclusion, the approximately $50,000 differential between the two subleases should not be applied to reduce Hoch's liability under the security agreement. The sublease was terminated and there is no reason in logic or law for Ellis to be required to pay the surplus rent over to Hoch. The sublease was not collateral for the promissory note (nor was the laundry equipment collateral for the sublease), and the trial court was not clearly erroneous [14] in finding that the increased lease rental was not a "covert profit."

The decision of the trial court should be affirmed.